William F. WALKER, Jr., et al., Claimants-Appellants,

v.

Arthur E. HARRIS, d/b/a Arthur Harris Marine Towing, Petitioner-Appellee.

No. 20735.

United States Court of Appeals Fifth Circuit.

June 18, 1964.

Rehearing Denied July 17, 1964.

Certiorari Denied Dec. 7, 1964.

See 85 S.Ct. 326.

Samuel C. Gainsburgh, N. B. Barkley, Jr., John P. Hammond, New Orleans, La., for appellant.

Paul A. Gaudet, New Orleans, La., Deutsch, Kerrigan & Stiles, Cornelius Van Dalen, New Orleans, La., of counsel, for appellee.

Before BROWN and WISDOM, Circuit Judges, and JOHNSON, District Judge.

JOHN R. BROWN, Circuit Judge:

The District Court held that a 52-year-old wooden inland tug which sank at sea in wind and weather which, although rough, she ought to have anticipated, was nonetheless seaworthy. Consequently, the Court granted the vessel owner's right to limit liability, 46 U.S.C.A. §§ 183–189, and, for double measure, held the owner free from negligence. This decision encompassed also the ruling that the lifeboat was sufficient, that is, seaworthy, even though none of the essential gear or supplies was tied down or stowed to prevent accidental loss when the lifeboat capsized in the effort to launch it after the manila fall in a boat davit parted apparently from old age. By this appeal the two survivors and the estates of two who did not complete the harrowing 110 hours in the lifeboat attack these actions. We reverse and remand for computation of damages.

All counsel in briefs and argument seem preoccupied with a question whether the Judge erred in declining to hold that the tug was unseaworthy (with the privity and knowledge of the owner) because of (a) deficient pumps and (b) the inadequacy of the glass in the sash-type windows in the deckhousing. As we approach the case, all of these things are now unessential since on basic principles, the evidence as a matter of law compelled the conclusion of negligent unseaworthiness causing the deaths and injuries. This also greatly simplifies our discussion of the evidence. As a preface we emphasize that while our result is contrary to that of the District Judge, we reach it without rejecting as clearly erroneous fact findings made below. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, 1954 AMC 1999; Roberts v. Echternach, 5 Cir., 1962, 302 F.2d 370, 373; Compania Anonima Venezolana De Nav. v. A. J. Perez Exp. Co., 5 Cir., 1962, 303 F.2d 692, 694.

The wooden tug RALPH E. HAVENS was built in 1905. She was 66.6 feet in length with a beam of 18.6 feet, a depth of 5.7 feet, and loaded draft of 7 feet aft with a freeboard of 18 inches. She was owned by petitioner-appellee Harris who, until relieved by Captain Wickizer a couple of days before, doubled in harness as Master. There is thus no real problem about privity and knowledge.

The RALPH E. HAVENS at the time of the casualty was homeward bound after delivering a tow on the East Coast. Crossing Florida inland waters, she came out into the Gulf of Mexico near Fort

Myers. From there she planned to parallel the West Coast of Florida until off Seahorse Reef whistle buoy at which time she would lay her course for Carrabelle, Florida, on the south coast of the Florida Peninsula, approximately 40 miles east of Apalachicola where she would return to inside waters. When she sunk about 3:00 a. m. Sunday, December 8, 1957, she was approximately 12 to 15 miles from Carrabelle.

The Tug departed off Fort Myers at 8:00 p. m. Saturday, December 7, 1957. Aboard were Captain Wickizer, Mate Sam Kelly, and deckhands Walker and Whitehead. Everything seemed to be in good order, and the Court was warranted in crediting the testimony that the weather reports were not then unfavorable.[1] She passed off of Edgemont Key the following morning at 6:00 a. m. December 8. This put her substantially abeam Tampa Bay. At 7:00 a. m. Sunday, December 8, she was about three to four miles off shore just above St. Petersburg. Weather changes, notably northwest winds, were predicted.[2] She passed abeam Seahorse whistle buoy at 5:00 p. m. Sunday, December 8. Northwestern winds were predicted in the noon forecast [3] and again in the evening [4] at which time (7:00 p. m.) the Tug was about 25 miles off the mouth of the Suwannee River. Some time between 10:00 p. m. and midnight of Sunday, December 8, the winds became strong northwesterly. This was verified by the next forecast of 1:30 a. m. December 9, Monday.[5] At midnight of Sunday, December 8, her position was approximately 30 to 35 miles, and at. the time of the 1:30 Advisory approximately 20 miles, southeast of Carrabelle. It is uncontradicted that at the time the wind and sea began kicking up, the closest port was Carrabelle, and no real complaint, as such, was made below or here that she should have turned tail for Tampa then over 100 miles away. The fact that she was yet so near and yet so far from a port of refuge, while not a fault as such, is nevertheless an important factor in evaluating her seaworthiness.

Whether the seas and wind became noticeably more severe closer to 10:00 p. m. than midnight, Sunday, December

1. Weather reports for the East Gulf are prepared and circulated from the Miami Weather Bureau office. The closest forecast in the record is that of Sunday, December 8, 1957, 1:30 a. m:

"Moderate west to northwest winds extreme north portion and moderate to fresh south to southwest winds elsewhere today and tonight except becoming moderate west to northwest central portion tonight. Monday winds becoming mostly fresh northwesterly. Considerable cloudiness with occasional rain north portion and partly cloudy south portion today and tonight. Monday clearing except partly cloudy with scattered showers extreme south portion."

2. The forecast of December 8, 1957, 7:30 a. m. was:

"Moderate variable winds north portion and moderate southeast to sound winds south portion shifting to fresh northwest to north over north portion tonight. Monday fresh northwest to north winds over north portion and moderate southerly shifting to moderate to fresh northerly over south portion by late afternoon. Mostly cloudy with scattered showers clearing north portion Monday."

3. Sunday, December 8, 1957, 1:30 p. m:

"Moderate occasionally fresh southwesterly winds over north portion shifting to mostly fresh northwesterly late tonight and Monday. Moderate variable mostly southerly winds over south portion shifting to mostly fresh northerly Monday afternoon. Considerable cloudiness with scattered showers clearing north portion Monday."

4. Sunday, December 8, 1957, 7:30 p. m:

"Mostly fresh northwesterly winds north portion and moderate occasionally fresh southwest to west winds south portion Monday, becoming northwesterly during afternoon. Considerable cloudiness with scattered showers central and south portions and over extreme north portion early Monday."

5. Monday, December 9, 1957, 1:30 a. m:

"Fresh northwesterly winds north portion and moderate occasionally fresh west to northwest winds south portion today becoming fresh northwest to north tonight and Tuesday. Considerable cloudiness with scattered showers south portion today, becoming partly cloudy tonight and Tuesday."

8, as testified to by Walker does not really matter. It is uncontradicted that at least by midnight, the wind and sea was increasing. Running into the north-westerly winds and sea, the Tug began to pound heavily and Kelly, the mate on watch, awakened Captain Wickizer about 1:30 a. m. When Captain Wickizer took over the wheel, Kelly went to the engine room because difficulty with the discharge pumps was being experienced. Captain Wickizer was faced obviously with a hard choice: To head on? To turn tail? To hold speed? To slow down? His decision was to head on but at reduced speed knowing that there were risks in this course. If speed were reduced too much, the Tug would fall off under wind and sea with danger of capsizing as she broached. On the other hand, increasing speed to offset this contingency presented the possibility that continuous pounding would open up her seams so that she would sink while driving ahead.

All were conscious, of course, of their great peril. With the Tug continuing ahead at reduced speed, efforts were made by others to increase the output of the bilge discharge pumps, the auxiliary pump, and two portable pumps since the water was gaining.[6] During these efforts, the Tug lost most of her steerage way, her bow fell off to starboard, a sea struck her port bow, she broached and wallowed in the trough of the seas. Efforts to head her up were unsuccessful, and two large waves piled over the port side breaking out the windows of the deckhouse. With the windows out, the Tug took in dangerous quantities of water, and it was evident that she would soon sink. It was plain that they would have to abandon ship. Captain Wickizer stayed at the wheel until the Tug's "waist" was nearly awash. In the meantime, Walker and Kelly had at-tempted to launch the lifeboat. According to Walker's testimony, while Kelly was letting out one of the falls from a lifeboat davit, it parted. This caused claimed injuries to Kelly and Walker insisted that this made it impossible to launch the boat by the davits. The District Court did not expressly discredit this part of Walker's story, but did find that Captain Wickizer instructed the men to wait "until the water reached their feet" when they were to jump "into the lifeboat" then resting on top of the deckhouse. The Judge found that "as they jumped the HAVENS sank and the afterdavit swung out, caught the gunwale of the lifeboat and capsized it." In any event, whether this manner of launching was due to a decision by the Captain, as the Court impliedly found, or from the parting of the boat fall as claimed by Walker, the lifeboat capsized at launching, and whatever was in it was washed away before the crew could right the boat.

Thus did the four, then scarcely 12 miles from shore, set out in the black of night during a storm without water breaker, food, tiller, sails or bailer. All they had was three oars. Lights visible from ashore and the short distance were beguiling. It was not until nearly four days later that Captain Wickizer brought the lifeboat ashore near Bayport, Florida, at about 5:00 p. m. on Thursday, December 12. The lifeboat had traveled approximately 140 miles to the southeast. The Captain and Walker were able to stagger to a farmhouse. With this help, Wickizer and Walker got to a hospital. But it was too late for Kelly and Whitehead. Each, unable to endure this experience in the open lifeboat, died while still at sea.

██ From reading this narrative account, one would suppose that the RALPH E. HAVENS had been overcome

---

6. The trial court found no negligence or unseaworthiness in the sufficiency of the pumps, the strainers, the inability to start the gasoline pumps, and the like. We may assume, *arguendo*, this to be supported. Nevertheless, there is no real dispute that the water was gaining, the pumps were not then effective, and the portable pumps would not operate. The situation was certainly "a condition" if not a "cause."

by tempestuous forces of the cruel sea which defy even the most prudent efforts. But on the testimony most favorable to the shipowner, it was no such case. Captain Wickizer fixed the force of the winds at 33 to 36 miles per hour, and the seas from 5 to 12 feet in height. The holding of the Court is that a vessel incapable of withstanding winds of this relatively low velocity and seas of limited height [7] is nevertheless seaworthy; that is, fit in the eyes of the law for the life and limb of those who go down to sea in ships. Almost instinctively one would think that this result could be justified on only one of two possibilities. The first would be that while these natural forces were relatively mild in contrast to, say, the North Atlantic in the winter, they were yet so severe and unpredictable for this time and place that the prudent shipowner had no reason to anticipate their occurrence. The second would be that, assuming the duty to anticipate seas and wind of this kind, some new and wholly unpredictable act intervened which made it reasonably impossible for the crew to extricate the ship from her expected peril. Neither of these conditions is established by the record and, when carefully analyzed, we do not think the Judge either held, or intended to hold, that they were. What, and all, the District Judge did was to create an entirely new standard of seaworthiness in which "reasonable fitness" is measured not in terms of the perils and forces to which crew, passengers, cargo, or tow are to be exposed, but rather in terms of the capacity of a particular craft to withstand such forces. By a process of circular reasoning, any craft in sound condition is seaworthy under this analysis if it can withstand all of the forces of sea and wind which a sound vessel of the same size and characteristics could withstand.

Thus the Judge in his initial opinion had this to say: "It is true that when a storm is relied upon to explain the sinking of a vessel the storm must be shown to have been of extraordinary intensity. Sabine Towing Co. v. Brennan, 5 Cir., 1934, 72 F.2d 490, 493. However, what constitutes 'extraordinary intensity' is a relative matter. The Supreme Court pointed out in Compania de Navegacion Interior, S.A. v. Firemen's Fund Ins. Co., 1928, 277 U.S. 66 [48 S.Ct. 459, 72 L.Ed. 787], that a large oceangoing vessel encountering what to it would be a light breeze could well be an exceedingly dangerous gale to a small, inland, wooden tug. Here we had a small, inland, wooden tug that encountered waves of 12 to 13 feet, which must surely constitute a storm of 'extraordinary intensity' to such a vessel." In re Harris, E.D.La., 1963, 216 F.Supp. 176, 178–179. In response to the petition for rehearing, the Judge, emphasizing the absence of any small craft warnings and the Captain's "right to assume that he would not encounter weather dangerous to the safety of his vessel," and the shortness of a 12-hour run from sea to a safe port [8] made his basic ruling even clearer. It was, he stated, "the unexpected and unforecasted encounter with 12-to-13-foot seas" which sank the Tug. "So," he went on, "unless all Gulf crossings by inland tugs at this point (Seahorse Reef buoy to Carrabelle, Florida) are prohibited, the captains of such vessels can only proceed on the basis of information available to them, and to do so is not negligence where the forecast weather is good, and to be unable to weather 12 to 13-foot seas under the cir-

---

7. On the Beaufort scale referred to by the Court below and in briefs here, winds at force 7 (32 to 38 miles per hour) are described as a "moderate gale" with accompanying seas described as "very rough" with waves 8 to 12 feet in height; force 8 (Winds 39–46 m. p. h.) are called "fresh gale" with seas similar to force 7.

8. "The HAVENS made this same trip in safety before, apparently without incident. No small craft warnings were forecasted and the captain had every right to assume that he would not encounter weather dangerous to the safety of his vessel. The trip would not require the HAVENS to be more than a 12-hour run to a safe port."

cumstances here does not render the vessel unseaworthy."

■■ Of course, no such standard is either supported by the law or this record. Seaworthiness, as that term has been defined and redefined, is reasonable fitness to perform or do the work at hand. Saunders v. Pool Shipping Co., 5 Cir., 1956, 235 F.2d 729, 1956 AMC 1351; Ionion Steamship Co. of Athens v. United Distillers of America, Inc., 5 Cir., 1956, 236 F.2d 78, 1956 AMC 1750; Tropical Marine Products Inc. v. Birmingham Fire Ins. Co., 5 Cir., 1957, 247 F.2d 116, 1957 AMC 1946; Vega v. The Malula, 5 Cir., 1961, 291 F.2d 415, 1961 AMC 1698; Delta Eng'r Corp. v. Scott, 5 Cir., 1963, 322 F.2d 11; Texas Menhaden Co. v. Johnson, 5 Cir., 1964, 332 F.2d 527, 528, nn. 1, 2 [No. 20713, May 13, 1964]. The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: what is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny, sufficient to withstand those anticipated forces? If the answer is in the affirmative, the vessel (or its fitting) is seaworthy. If the answer is in the negative, then the vessel (or the fitting) is unseaworthy no matter how diligent, careful, or prudent the owner might have been. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L. Ed.2d 941, 1960 AMC 1503.

■ The question in this case boils down then to whether winds and seas of the kind actually encountered at this fateful moment were reasonably to be anticipated. On this record there cannot be any doubt. Indeed, it comes from the shipowner's own case and from its most professionally distinguished witness, Captain Bachrach, licensed master mariner and experienced marine surveyor who had approved the vessel for insurance purposes in 1956 including "occasional" trips across the upper corner of the Gulf if towing not more than one barge. As would an Elder Brethren of Trinity House, Calmar Steamship Corp. v. Scott, 1953, 345 U.S. 427, 432, 73 S.Ct. 739, 97 L.Ed. 1125, 1953 AMC 952; United Geophysical Co. v. Vela, 5 Cir., 1956, 231 F.2d 816, 819, 1956 AMC 745, he supplied not only irrefutable factual evidence, but informed, professional expertise on vessel operation with the blending of both into an appropriate principle or conclusion of law. Thus, in connection with the studies he testified he had made to enable him to approve tows in these waters, he was asked, "Did you learn that the 'northwesters' come up rather suddenly with a considerable amount of violence?" To that he answered, "That's correct. In fact, they usually all come up that way." This is in no way watered down by his other testimony that usually there will be some forecasted warning. Indeed, the warning he speaks about serves only to demonstrate, in his professional judgment, the intensity and severity of the seas and winds to be encountered and the necessity for turning tail for port without delay.[9] With a full awareness of the significance of the questions and the importance of the answers, Captain Bachrach then reduced the case to tangible and decisive terms:

"Q. Now, any vessel operating in the Gulf of Mexico in this area

9. Immediately following the testimony just quoted, he testified:
"Q. They come up quite suddenly, is that right?
"A. Yes, but they usually—usually there is a forecast on them, which you can get, but I will say this: A 'northwester' in the Gulf of Mexico can put out some strong winds.
"Q. There isn't anything unusual about a thirty-five mile an hour wind in connection with a 'northwester', is there?

"A. That's right.
"Q. That's routine, isn't it. Aren't winds of that velocity a common thing with a 'northwester'?
"A. Yes, I would say so, but you usually do have some warning, and when you get a warning you are supposed to head for shelter, but they do come up quite frequently."

therefore must be reasonably fit to stand these 'northwesters', is that not correct?

"A. I would say so, yes.

"Q. Any vessel that is going to put out from Fort Myers to Carrabelle has got to anticipate that sort of weather forecast, particularly in the latter part of the year, isn't that right?

"A. Well, you can say that, yes, just the same as for any vessel starting out with a tow from New Orleans through the Gulf of Mexico, because you are going to have those weather disturbances out in the gulf frequently that time of year.[10]

"Q. Isn't it true that any vessel operating in the Gulf of Mexico between Fort Myers and Carrabelle in the wintertime should be reasonably fit and suitable and overcome a 'northwester'? Isn't that right?

"A. That's correct, yes.

"Q. And if she cannot do so, sir, I take it, you could agree with me that she is not seaworthy? Would you answer that yes or no, sir?

"A. I agree."[11]

So do we, and so do other courts. Thus, in R. T. Jones Lumber Co. v. Roen Steamship Co., 2 Cir., 1959, 270 F.2d 456, 1960 AMC 46, the Court held that cargo damage resulting from seas 12 to 15 feet high and wind of 50 m. p. h. was not due to a peril of the sea in the light of supportable factual findings "that the storm was not an unusual event for Lake Erie in November but one which could reasonably be anticipated and provided against." Similarly, in petition of Moore-McCormack Lines, Inc., S.D.N.Y., 1958, 164 F.Supp. 198, 1958 AMC 1497, the Court rejected a defense based on winds of force 8, seas of 20 to 22 feet since "The weather * * *, though rough, was no worse than was common off Hatteras during October and so, was to be expected on this voyage. A stable seaworthy vessel, properly navigated and managed, should have been able to survive in it." Rejecting a defense of a moderate gale of 30 knots, the Court in Eastern Gas and Fuel Associates v. Martin Marine Transit Company, 3 Cir., 1951, 190 F.2d 394, 1951 AMC 1518, referred to the "prevailing and, in our judgment, correct judicial view * * * expressed in The Manuel Arnus, D.C. S.D.N.Y., 1935 [1935 AMC 786, 792], 10 F.Supp. 729, 732: '* * * the weather must be irresistible, overwhelming, and extraordinary for the particular time of year to be a good exception * * *.'"

Nothing in the celebrated dicta [12] of the Wash Gray,[13] so heavily relied on by the District Court, is to the contrary. The problem in that case was not the standard of seaworthiness exacted by the law for the protection of life and limb of passengers or crew members or the care and custody and delivery of cargo entrusted to a vessel. Rather, it was whether the damage sustained by the insured vessel was caused by a peril of the sea as defined in a private insurance contract between owner and underwriters. Complicating that case, too, was the admitted insufficiency—hence, un-

10. Captain Wickizer confirmed this testimony of Captain Bachrach:
 "At the time of the year the Havens sank, a northwester is not uncommon?
 "A. No, not uncommon."

11. The crucial nature of these responses is highlighted by Captain Wickizer's testimony as to the cause of the sinking:
 "Q. Do you think the failure of the pump had anything to do with the vessel sinking?
 "A. No doubt that had some bearing on it, but the sea, I believe was the main thing."

12. The Court stated: "What amounts to a light breeze, or a small swell, or a choppy sea, as logged for a large ocean-going steel vessel would be relatively, if logged for a little inland, wooden tug, with two or three feet of freeboard, an extremely dangerous gale and rough seas." 1928, 277 U.S. 66, 79, 48 S.Ct. 459, 72 L.Ed. 787, 1928 AMC 923.

13. Compania de Navigacion v. Firemen's Fund Ins. Co., 1928, 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787, 1928 AMC 923.

seaworthiness—of the Wash Gray to go outside. Notwithstanding this, the underwriters purposefully issued the insurance with full knowledge of, and acquiescence in, the proposed voyage, and exacted a higher premium therefor. So much is wrapped up in that kind of case, the nature of the assured's warranty of seaworthiness, if any, its extent and duration in point of time, and the like, that it is not safe to conclude that losses from a "peril of the sea" or those caused by "unseaworthiness" are always mutually exclusive. Saskatchewan Government Ins. Office v. Spot Pack, 5 Cir., 1957, 242 F.2d 385, 1957 AMC 655; Tropical Marine Prod. v. Birmingham Fire Ins. Co., 5 Cir., 1957, 247 F.2d 116, 1957 AMC 1946. More important, insurance cases which turn on the law's quest for the contractors' intention [14] are poor analogies in assaying the "public" duties imposed by law on ships and shipowners for the protection of people and property.

▮ This analysis brings us, therefore, to the application of the familiar doctrine, so often invoked where vessels sink in calm waters,[15] that sinking (or other failure) under circumstances and conditions which the vessel must reasonably anticipate and overcome is the best proof of, and makes out the classic case of, unseaworthiness. Although not articulated in such terms, it is a sort of sea-going *res ipsa loquitur*. Once it is assumed (or judicially held) that the vessel must anticipate the particular hazard and be staunch enough to override it, the only escape from the inference of unseaworthiness is proof that some new, unforeseen, intervening force or factor brought about the failure of ship or gear. There is none of that here.

It is true, of course, that the sudden increase in the northwester put tug and captain in a difficult spot. To head on or turn tail? To maintain or reduce speed? Risk pounding and leakage? Avoid pounding but risk broaching? It it equally true that the mortal blow came from the broaching which we may assume was the unavoidable consequence of the non-negligent decision to slow down. Aggravating these choices and the consequences of decision were the other characteristics of the Tug. This included such things as sash type windows with ordinary window glass panes. And so did the pumps which, although claimed by the shipowner, and found by the Court, to be in good condition, were nevertheless unable to keep up with the intake of sea water. But none of these things or conditions was unknown, unexpected, or unpredictable. Indeed, it was just such things which made the Tug reasonably unfit for these waters in this season. Forces and conditions which she had the duty of anticipating cannot amount to an intervening and new cause to excuse the disastrous result.

Nor does the absence of a small craft warning from the United States Weather Bureau afford any excuse. Although testimony indicates that some warning is often available, the record is overwhelming that northwesters can, and as happened here do, arise on short notice. The District Judge placed great emphasis upon the shipowner's contention that these voyages across the upper corner of the Gulf were short in time, generally close into shore, and never more than 12 hours from a port of refuge. But the 15–20 miles from the point of sinking to Carrabelle was much too much. And the 2½ hours to make good this distance was more time than the Tug had. Indeed, to accept the shipowner's contention would be to hold that the Tug was entitled to 24 hours' notice of weather

14. American Agric. Chem. Co. v. Tampa Armature Works, 5 Cir., 1963, 315 F.2d 856, 860, 861 (concurring opinion); Saskatchewan Government Ins. Office v. Spot Pack, 5 Cir., 1957, 242 F.2d 385, 1957 AMC 655; Tropical Marine Prod. v. Birmingham Fire Ins. Co., 5 Cir., 1957, 247

F.2d 116, 1957 AMC 1946; Reliance Ins. Co. v. Yacht Escapade, 5 Cir., 1960, 280 F.2d 482, 1961 AMC 2410.

15. Tropical Marine Prod. v. Birmingham Fire Ins. Co., 5 Cir., 1957, 247 F.2d 116, 118, nn. 3, 4, 1957 AMC 1946, collects the cases.

changes in the Gulf, a luxury nowhere supported by any evidence in this record other than the dubious one that providence, good fortune, wind, weather and tide had smiled on previous trips which had been safely made. Thus when passing abeam St. Petersburg about the time of the December 8, 1957, 7:30 a. m. forecast, note 2, supra, it was known that the Tug, 12 hours later (7:30 p. m.) [16] would be at the "point of no return" where, to continue on to Carrabelle, meant substantially another 12 hours at sea with alternative ports of refuge getting farther and farther away as she pressed on her NW course. There is no evidence in this record which would remotely support the conclusion that at this time and season, a small inland tug following this course could expect 24 hours' advance warning of northwesterly winds of a moderate velocity of 33–36 m. p. h. with wind driven seas of 5 to 12 feet in height. The Tug therefore had to have the capabilities of withstanding winds and seas of that expected power which might arise during the last, but vital, 12-hour, 100-mile leg toward Carrabelle. The duty to furnish a seaworthy vessel is on the shipowner. That duty is neither lessened nor eliminated here by the absence of small craft warnings.

We think the Judge likewise erred as to the seaworthiness of the lifeboat.

Since it is argued that the nature of the equipment and the manner of its stowage is irrelevant if a lifeboat was not required, the first question is whether the law imposed a duty on the Tug to have a lifeboat aboard. The statute does not literally require it since the RALPH E. HAVENS was not a "steam vessel" but rather a motor vessel powered by diesel engine. There is no doubt that had the RALPH E. HAVENS been powered by steam, she would have met the literal requirements of 46 U.S.C.A. § 481 which prescribes that "Every steamer navigating the ocean, or any lake, bay, or sound of the United States, shall be provided with such numbers of lifeboats, floats, rafts, life-preservers * * * as will best secure the safety of all persons on board such vessel in case of disaster * * *. And the Commandant of the Coast Guard shall fix and determine, by rules and regulations, * * * the character of lifeboats, floats, rafts, life-preservers * * that shall be used on such vessels * * *." [17]

The 1954 statutory regulations are detailed and exacting concerning the equipment of every lifeboat and the

16. As of 7:30 p. m. Sunday, December 8, northwesterly winds had to be reckoned with. The forecast at noon, 1:30 p. m., see note 3, supra, predicted "mostly fresh northwesterly" winds "late tonight and Monday." This was renewed in the 7:30 p. m: forecast (see note 4, supra) predicting "mostly fresh northwesterly winds north portion." On U.S. Weather Bureau standards, the term "fresh" describes winds 19–24 m. p. h. (Beaufort force 5), only slightly less than the winds estimated by Captain Wickizer to be 33–36 m. p. h. which by Weather Bureau standards are described as "strong" (Beaufort, force 7).

17. As amended August 30, 1954, § 1(29), ch. 1076, 68 Stat. 968. As then enacted the statute included detailed regulations which were, in effect, prescribed as the "minimum requirements." The 1954 Amendment did repeal the earlier requirement that all regulations authorized by the section be submitted to Congress as soon as practicable after being adopted. See Legislative History, 1954 U.S.Code Cong. & Adm.News 35–39. Section 481 was substantially amended in 1959, subsequent to the date of this casualty. Public Law 86–244, § 1, 73 Stat. 475; see 1959 U.S.Code Cong. & Adm.News p. 2283. Statutory minimum regulations were deleted, but substantial civil penalties against the ship and shipowner, as well as the master, were prescribed. The effect is to invest more, not less, power in the Coast Guard by requiring the promulgation of "such rules and regulations as may be necessary for vessels subject to inspection and certification by the United States Coast Guard" with respect to among other things, "(1) [l]ife-saving equipment, including, but not limited to, the number, type, size, capacity, details of construction, methods of operation, stowage, maintenance, manning, use, testing, and inspecting of such equipment * * *."

manner of its stowage including, as a matter of special interest here, requirements for bailers, masts with a good sail and proper gear and minimum specified supplies of food and water in water-tight receptacles.[18] Even more important, the regulations require that "all loose equipment must be securely attached to the boat or pontoon raft to which it belongs."

Any statutory duty to provide a lifeboat turns on whether a motor powered tugboat is a "steam vessel" and if so, whether it is a "vessel subject to inspection." The first is taken care of by 46 U.S.C.A. § 361 which provides that "Every vessel subject to inspection propelled in whole or in part by steam or by any other form of mechanical or electrical power shall be considered a steam vessel within the meaning of and subject to all provisions of this Act." We can share with Judge Holtzoff the feeling that a definition of this kind in terms of that which it is not is, without "doubt * * * not the most artistic type of legislative draftsmanship. * * *" But as did he, we conclude that "Nevertheless, the Congress has a right to legislate by definition if it chooses" and having done so, § 361 incorporates for motor vessels "subject to inspection"[19] the requirements of § 481. Ace Waterways, Inc. v. Fleming, S.D.N.Y., 1951, 98 F. Supp. 666, 1952 AMC 327.

But whether, strictly speaking, this is a "vessel subject to inspection" is a much more difficult matter. Without examining the exact terms of the Coast Guard regulations in force in 1957, the current regulations §§ 90.05–1[20] and 24.01–1 et seq[21] by Tables 90.05–1(a) and 24.05–1(a) put in the category of "vessels subject to provisions of subchapter C—uninspected vessels" motor powered vessels not exceeding 300 gross tons or over 15 gross tons.[22] The Tables distinguish between steam and motor powered vessels over 65 feet in length. If steam powered, none are exempt as uninspected vessels (column 6) and all are subject to inspection (column 5) if

---

18. These may conveniently be found at 46 U.S.C.A. § 481 at pp. 171, 179–80 (1958) (volume containing §§ 251–681):
"First. The normal equipment of every boat shall consist of—
"(a) A single banked complement of oars and two spare oars; one set and a half of thole pins or crutches; a boat hook.
"(b) Two plugs for each plug hole (plugs are not required when proper automatic valves are fitted); a bailer and a galvanized iron bucket.
"(c) A tiller or yoke and yoke lines.
"(d) Two hatchets.
"(e) A lamp filled with oil and trimmed.
"(f) A mast or masts with one good sail at least, and proper gear for each. (This does not apply to motor lifeboats or lifeboats on the Great Lakes or other inland waters.)
"(g) A suitable compass. * * *
"Third. In addition, every boat and every pontoon raft shall be equipped with—
"(a) A life line becketed around the outside.
"(b) A sea anchor.
"(c) A painter.
"(d) A vessel containing one gallon of vegetable or animal oil. The vessel shall be so constructed that the oil can be easily distributed on the water and so arranged that it can be attached to the sea anchor.
"(e) A water-tight receptable containing two pounds avoirdupois of provisions for each person, except on vessels navigating fresh water.
"(f) A water-tight receptacle containing one quart for each person, except on vessels navigating fresh water.
"(g) A number of self-igniting 'red lights' and a water-tight box of matches.
"Fourth. All loose equipment must be securely attached to the boat or pontoon raft to which it belongs."

19. The 1959 Amendments to § 481 are likewise limited to "vessels subject to inspection and certification," see note 17, supra.

20. Subchapter I Cargo and Miscellaneous Vessels, Title 46 C.F.R. revised as of January 1, 1963.

21. Subchapter C—Uninspected Vessels.

22. This assumes, of course, that such motor vessel is not a tank vessel (column 3), a passenger vessel (column 4) and not a vessel carrying dangerous cargoes, 46 C.F.R. Part 98 or 146 or carrying freight for hire.

not otherwise subject (columns 3 and 4). As to motor powered vessels, however, whether under 15 gross tons or between 15 and 300 gross tons, they are exempt (column C).[23] This administrative classification certainly seems at odds with Judge Holtzoff's thesis in Ace Waterways. From our untutored vantage, the only basis for distinction is 46 U.S.C.A. § 367 which extends steam vessel inspection requirements to "sea going vessels of three hundred gross tons and over" when motor powered. This basis for distinction Judge Holtzoff rejected. 98 F.Supp. 666, 668.

It would take a better juridical radar-eye than we now have to penetrate this legislative-administrative fog. We should in any event "navigate with caution." Cf. Rule 16, 33 U.S.C.A. § 145n.

■ For the purposes of our case we do not think that time is at hand to unravel this legislative hodgepodge. Cf. McConville v. Florida Towing Corp., 5 Cir., 1963, 321 F.2d 162, 168 n. 9, 1963 AMC 1456. This is so because we are of the firm view that with or without statutory requirement and wholly independent of Coast Guard regulations, no vessel putting to sea in the open waters of the Gulf of Mexico on a voyage which will put the ship as much as 12 hours from shore in December is seaworthy unless it has at least one lifeboat suitably equipped. Likewise, for the lifeboat to be suitably equipped—that is seaworthy—it must have a mast with suitable sail and gear, bailers, a painter, sea anchor, rudder and tiller, distress signals and, above all, fresh water and provisions in sealed watertight containers. And since none of these is of any value when lost overboard if the lifeboat capsizes or is swamped in launching, it is essential that these items be lashed or tied or otherwise stowed to prevent such loss.

This represents no intrusion into the legislative domain and certainly not in maritime matters where most of the controlling law has been and still is judge-made. Far from an innovation, failure of an admiralty court at this day and time to recognize the imperative necessity for a suitable lifeboat on an ocean-going vessel would put it completely out of step with the times. Indeed, a court would be at least 75 years behind the times.[24]

■ If—and there is really no if—an admiralty court either on "notions of ordinary prudence implicit in the concept of due care or the exacting standards of seaworthiness [may] call for an owner to supply more than the bare facility exacted by statutory or regulatory law," Schlicter v. Port Arthur Towing Co., 5 Cir., 1961, 288 F.2d 801, 804, 1961 AMC 1164, it is self-evident that such a court can draw on statutory policies to fashion a like or suitable standard to fill an obviously unintended gap or to give full voice to a clear legislative purpose to protect life and limb. Cf. Lincoln Mills of Ala. v. Textile Workers Union, 5 Cir., 1956, 230 F.2d 81, 89, 92–93 (dissenting opinion), reversed, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. What—and all—we do is to bring the maritime law abreast the minimum legislative demands for lifesaving equipment for a vessel which ought not to be but is in fact a sea-going ship. See note 18, supra. The 1963 Coast Guard regulations in Table 94.20–10(a) requires all of the equipment, and more, called for in the 1954 regulations. § 94.20–5(d) likewise requires that "loose equipment, except boathooks in lifeboats, shall be securely attached to the lifesaving appliance to which it belongs." And § 94.20–15 describes in detail the (a) bailer, (d) bucket, (w) oars, (r) locker, (s) mast and sail, (z) painter, (bb) provisions, (cc) rowlocks, (jj) water, (1) 3 quarts per person, (2) "the drinking water containers shall be stowed in drinking water tanks, lockers, or other compartments

**23.** They are not exempt if they are tank vessels, or carrying passengers, freight, or certain dangerous cargoes. (See note 22, supra.)

**24.** § 481 is the successor to R.S. § 4488 (1875) and the earlier Act of February 28, 1871, § 52, ch. 100, 16 Stat. 455.

7

 No difficulty is presented as to the proof of unseaworthiness from the inadequate equipment of the lifeboat. The master did testify that after the capsizing there were three oars left and at least two oarlocks, and that from an earlier casual inspection in port he had observed that it contained at least a water breaker and perhaps a bread breaker. The Judge in his supplemental opinion stated, "The evidence is not entirely satisfactory as to what provisions and equipment the lifeboat carried. * * * Captain Wickizer thought, though he was not absolutely positive that there were oars, oarlocks, water breaker and what looked like a bread breaker in the boat." On this deficiency of proof he found no lack of due care or unseaworthiness. But this was to reverse the tables. It was on the tug-owner-petitioner to prove that the lifeboat was adequate, hence seaworthy. The doubt reflected by the District Judge means the petitioner failed to establish his right to limit liability. The claimants, on the other hand, adequately carried their burden because it was uncontradicted that when the lifeboat capsized, all of the provisions and fittings other than three oars and two oarlocks were lost. Perhaps even more critical, there was no mast with sails, an appliance so badly needed and which this close to shore would have likely shortened the time in the lifeboat and enhanced the chance of survival.

 The case therefore requires as a matter of law a finding of unseaworthiness of tug and lifeboat with the privity and knowledge of the tug owner as to the injury claims. So does it as to the death claims and the claim for conscious pain and suffering prior to death. There may be, of course, questions, oftentimes troublesome, as to whether death actions are under the Death on the High Seas Act, 46 U.S.C.A. § 761, the survival provisions of the Jones Act, 46 U.S.C.A. § 688, 45 U.S.C.A. §§ 51, 59, or the local Florida Death Act, Fla.Stat.Ann. § 768.-01, see Emerson v. Holloway Concrete Prod. Co., 5 Cir., 1960, 282 F.2d 271, 278, 1961 AMC 1484, 1492 (dissenting opinion), and whether a claim for death due solely to unseaworthiness survives, Fall v. Esso Standard Oil Co., 5 Cir., 1961, 297 F.2d 411, 417, n. 7, 1962 AMC 951. But we eliminate all of these difficulties by also holding that, as a matter of law, the unseaworthiness of the RALPH E. HAVENS and her lifeboat was occasioned "in whole or in part from the negligence" of the shipowner thus putting the cause of action under the Jones Act. Vickers v. Tumey Towing Co., 5 Cir., 1961, 290 F.2d 426, 429–432, 1961 AMC 1173; Cox v. Esso Shipping Co., 5 Cir., 1957, 247 F.2d 629, 637, 1957 AMC 1927; Michalic v. Cleveland Tankers, 1960, 364 U.S. 325, 81 S.Ct. 6, 5 L. Ed.2d 20, 1960 AMC 2251.

The result is that the decree of exoneration and limitation of liability must be set aside, and on the remand the District Court is directed to enter appropriate decrees denying the right to limit liability, holding the petitioner-tugowner liable for personal injury and death claims as a result of the negligent unseaworthiness of the Tug RALPH E. HAVENS, her lifeboat and its equipment and fittings. This will leave nothing but the question of ascertaining the nature and extent of the damages and the awards to be made therefor.[25]

Reversed and remanded with directions.

25. As our decision recognizes a right of action on behalf of Kelly and his survivors for conscious pain and suffering as well as other injuries sustained while still alive in the lifeboat, and also for his resulting death, we think any additional allowance for his alleged injuries in launching the lifeboat would be relatively *de minimis.* The effect is that, to this very limited extent, we affirm that portion of the District Court's decree.