William D. ZERINGUE

v.

GULF FLEET MARINE
CORPORATION.

Roy Wayne EGGLESTON

v.

GULF FLEET MARINE
CORPORATION.

Kenneth A. DOWNEY

v.

GULF FLEET MARINE
CORPORATION.

Civ. A. Nos. 83–3753, 83–4896
and 84–2333.

United States District Court,
E.D. Louisiana.

Dec. 17, 1986.

---

Roger S. Bernstein, Bernstein & Bernstein, New Orleans, La., Vincent J. DeSalvo, George & George, Ltd., Donald G. Cave, Cave & McKay, Baton Rouge, La., Leonard A. Radlauer, New Orleans, La., for plaintiff.

Edward F. Kohnke, IV, Miles P. Clements, Terry McCall, Lemle, Kelleher, Kohlmeyer, & Matthews, New Orleans, La., for defendant.

## MEMORANDUM OPINION

MENTZ, District Judge.

This consolidated action arises out of the sinking of the M/V GULF GALE on March 3, 1983. Three of the crewmembers brought suit against Gulf Fleet Marine Corporation (Gulf Fleet), the owner and

operator of the M/V GULF GALE, claiming damages for personal injuries. Gulf Fleet stipulated liability under General Maritime Law and asserted the defense of limitation pursuant to 46 U.S.C. § 183, *et seq.*, on the basis that the sinking of the M/V GULF GALE was caused by weather and navigational errors not within its privity or knowledge. The limitation issue was tried to the Court with the question of damages reserved for later determination. The Court now renders its ruling on the limitation issue.

The M/V GULF GALE, a 3600 horsepower twin screw ocean going tug, sank on March 3, 1983 in the Gulf of Mexico. Before the commencement of the voyage, the vessel was inspected by the American Bureau of Shipping (ABS) at Gulf Fleet's request. The purpose of the inspection was to obtain an extension on the dry dock survey and to carry out the annual classification survey and annual load line inspection. The ABS surveyor, having found that the vessel met the ABS minimum requirements, listed the vessel in satisfactory condition, granted a six month extension to dry dock, and recommended that the vessel be continued as classed and that the load line be renewed.

Following the ABS survey, Captain Fred Watkins and his crew boarded the vessel in Corpus Christi, Texas. Gulf Fleet's port engineer, Clarence Santos, advised the Captain and the crew engineer, Leonard Pinder, that they were not to store any fuel in the No. 4 fuel tank because of a hole or crack in the bulkhead between the No. 4 fuel tank and the No. 2 ballast tank about three or four inches from the bottom of the tank. Santos told Pinder to put some Red Hand (a compound to stop leaks) on the crack, but Pinder did not have enough time to make the repair before the vessel sailed. Pinder stored all the fuel in the remaining fuel tanks. Santos was aware that the vessel sailed without the crack being repaired.

After leaving the port of Corpus Christi, the vessel proceeded to the West Cameron area of the Gulf of Mexico, where it participated in a rig move. The vessel was then instructed to head east to the Eugene Island sea buoy to standby to assist a barge. The vessel stood by at the buoy for several days, but the barge never arrived. During this time, the weather progressively worsened, with winds of twenty-five to thirty knots and seas of twelve to fifteen feet. These were heavy seas, but not out of the ordinary.

On March 3, 1983, the vessel received instructions from Gulf Fleet to proceed east to a job location in the South Timbalier area of the Gulf of Mexico. From noon to six o'clock during the mate's watch in the wheelhouse, the M/V GULF GALE was proceeding at one-quarter throttle on indirect courses which kept the seas quartered. During this period the vessel experienced no difficulty. At approximately six o'clock, the Captain assumed the watch. After hearing a forecast on the television that there was a severe tornado watch in the area, the Captain took a more direct shoreward course and increased the speed of the vessel to three-quarters throttle in order to quickly move out of the storm area. The Captain was headed east; the waves were from the south. By setting this course, the Captain was running in the trough between the wave crests which allowed the seas to hit the M/V GULF GALE broadside or on the starboard. After changing course, the Captain spent time trying to focus the radar. The starboard radar was not operating properly in that it could only pick up two miles and the port radar was completely out.

At approximately seven-thirty o'clock, the Captain noticed the vessel was listing five to ten degrees to the port by the stern. At this point, the engineer, Pinder, noted that the stern was three to four feet under water. The engineer recommended the Captain lift the stern out of the water by slowing down and turning the vessel to port. The Captain agreed and slowed the vessel's speed, but incorrectly turned the vessel starboard further lowering the port stern into the water. Immediately thereafter, the main generator failed. The engineer then activated the auxiliary generator, which started and ran for ten seconds, before failing too. Both generators, as well

as the engines and tow winch, operate from a single fuel tank called the day tank. Without power from the generators, the vessel lost electrically powered hydraulic rudder control and it was impossible to pump ballast or fuel to get the vessel back to normal keel. After both generators went out, the port engine stopped. The Captain, realizing that without generators, the crew would have to abandon ship, pulled the starboard engine out of gear so the propeller would not strike the life raft.

By this time, the vessel was listing heavily and the stern was completely under water. The door to the engine room, which did not have water in it yet, was closed at this time. The Captain ordered the crew to abandon ship. The crew attempted to launch the inflatable life raft which failed to properly inflate. The life raft was inflated only after much difficulty. The crew was thus able to abandon ship and were later rescued by a shrimping vessel. The total period of time from when the vessel first began to list to the time the crew abandoned ship was approximately forty-five minutes. The M/V GULF GALE sank shortly after the crew abandoned her.

 The determination of whether a shipowner is entitled to limit liability is a two-step process. First, the court must determine which acts of negligence and/or conditions of unseaworthiness caused the sinking. Second, the court must determine whether such acts or conditions were within the privity or knowledge of the shipowner. *Verrett v. McDonough Marine Service*, 705 F.2d 1437, 1443 (5th Cir.1983). Ordinarily, the initial burden of proving negligence or unseaworthiness rests with the claimants. In the instant case, Gulf Fleet has stipulated "liability under the General Maritime Law." In consideration for this stipulation, plaintiffs agreed to dismiss "all claims under the Jones Act." Defendant disputes that it stipulated unseaworthiness. Plaintiffs had only two causes of action: (1) negligence under the Jones Act, and (2) unseaworthiness under the General Maritime Law. As seamen, plaintiffs did not have a cause of action for negligence under the General Maritime

Law. *See The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760, 764 (1903); *Ivy v. Security Barge Lines, Inc.*, 606 F.2d 524, 525 (5th Cir.1979), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815 (1980). Clearly, plaintiffs' only conceivable basis of recovery under the General Maritime Law is for unseaworthiness. Gulf Fleet's contention that the stipulation of liability under the General Maritime Law is not a stipulation of unseaworthiness is without merit.

 The parties having stipulated that the M/V GULF GALE was unseaworthy, and plaintiffs having dismissed their claim for negligence under the Jones Act, Gulf Fleet bears the burden of showing that the unseaworthiness did not contribute to the sinking and was not within its privity or knowledge. *See Matter of Texaco, Inc.*, 570 F.Supp. 1272, 1278 (E.D.La.1983). Privity is defined as fault or neglect in which the shipowner personally participates; knowledge is defined as the means of personal cognizance or means of knowledge, of which the shipowner is bound to avail himself, of a contemplated loss or condition likely to cause the loss, unless proper means are adopted to prevent it. 3 *Benedict on Admiralty*, § 41 (7th Ed. 1981).

[T]he question with regard to corporate owners is not what the corporation's officers and managers *actually* knew, but what they objectively *ought* to have known. G. Gilmore & C. Black, *The Law of Admiralty* (2nd Ed.1975) at 886. The measure of the scope of this subjective knowledge has been explained in terms of a corporation's duty to exercise control over its vessels to the extent reasonably possible. *Id.* at 886–895.

*In the Matter of Patton-Tully Transportation Company*, 797 F.2d 206, 211 (5th Cir.1986).

 Plaintiffs contend that the M/V GULF GALE was unseaworthy in the following respects: (1) a crack between the No. 4 port fuel tank and the No. 2 port ballast tank; (2) lack of gooseneck balls in the gooseneck valves; (3) failure of radar to function properly; and (4) the Captain

and engineer were not trained to perform stability calculations. Plaintiffs also contend that the life raft was unseaworthy. Gulf Fleet contends that the sinking of the M/V GULF GALE was caused by the weather and navigational and operational errors not within its privity or knowledge.

Gulf Fleet cannot rely on the storm to explain the loss of the M/V GULF GALE. A stable, seaworthy and properly navigated vessel should have easily withstood the weather conditions on the date of the sinking. A vessel sailing in the Gulf of Mexico must reasonably anticipate that it will encounter and be able to withstand winds of twenty-five to thirty knots and seas of twelve to fifteen feet. Such conditions are not uncommon or of "extraordinary intensity." *See Walker v. Harris,* 335 F.2d 185, 193 (5th Cir.1964), *cert. denied,* 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342; *The Cleveco,* 154 F.2d 605, 615 (6th Cir.1946).

Gulf Fleet argues that had the Captain maintained the course set by the mate, the vessel would not have sunk. While the mate was at the wheel, the M/V GULF GALE proceeded without difficulty at one-quarter throttle with the seas quartered. When the Captain took over from the mate, he decided, in an attempt to evade the storm, to increase the speed to three-quarter throttle and turn shoreward, running the vessel in the trough. The Captain's change of course allowed the seas to hit the vessel broadside and, when combined with the increased speed, which lowered the stern in the water, the waves washed over the stern of the vessel, further lowering the stern in the water. After the Captain changed course, the vessel developed a ten to fifteen degree list to the port by the stern. In an attempt to correct the list, the Captain slowed the engines and incorrectly turned starboard, rather than port, further pushing the stern in the water. Clearly, a cause of the sinking was the navigational errors of the Captain which caused the vessel to take on water by the stern. The Captain's course of action, which he undertook in an effort to protect his ship and crew from the worsening storm, does not preclude the limitation defense because Gulf Fleet was without privity or knowledge.

Leonard Pinder, the vessel engineer, testified in deposition, that he believed the list was caused when the snatch line, a line of nylon rope used during towing, blocked the scuppers or freeing ports on the port stern of the vessel. Pinder testified that the waves washing over the stern washed the snatch line, which had been lying lose in the middle of the deck, so that it blocked the scuppers on the port stern of the vessel. Pinder was the only witness who testified that the snatch line was blocking the scuppers. No other member of the crew testified to that effect. Photographs of the M/V GULF GALE clearly show that the scuppers were too large for a snatch line to completely clog the scuppers to the point where a fifteen degree list resulted. Further, witnesses for both sides testified that the vessel was rolling heavily from port to starboard. Even if the port scuppers were completely clogged, the water would have run off the deck through the scuppers on the starboard side. Thus, the Court finds that the clogged port scuppers did not cause the list or the sinking of the M/V GULF GALE.

Other evidence of operational errors included the testimony of plaintiffs, William Zeringue and Kenneth Downey, that some of the watertight doors were left open while the vessel was underway. However, these same witnesses, as well as the Captain and the engineer, testified that there was no water inside the vessel at the time the list developed or prior to the sinking. Accordingly, the Court finds that the failure to close some of the watertight doors did not cause the sinking of the M/V GULF GALE.

■ Plaintiffs contend that a crack between the No. 4 port fuel tank and the No. 2 port ballast tank caused the vessel to be unstable and allowed water to contaminate the fuel. For three months prior to the sinking of the M/V GULF GALE, seven notations were entered in the engine logs documenting the presence of water in the No. 4 port fuel tank. In one entry, dated December 19, 1982, the crew engineer not-

ed water in the No. 4 port fuel tank and removed 120 gallons of water from the day tank, from which both generators run. In another entry, dated February 7, 1983, the crew engineer noted that the No. 4 fuel tank had about four feet of water in it. On February 16, 1983, one day prior to the inspection by the ABS surveyor, the crew engineer noted the following in the engine log:

> Took on 39,000 gal fuel and 959 gal lub oil took cone off fuel tank No. 4 port has water come from No. 2 balast tanks let it air out had to vent balast in the No. 2 balast tank to level up the boat will tell the other eng were (sic) the hole at and when to use up the fuel out are (sic) the No. 4 sted he can put some red hand on it.

The engine log entries clearly indicate the existence of a crack between the No. 4 port fuel tank and the No. 2 port ballast tank. Gulf Fleet's expert marine surveyor, Shawn G. Bartnett, testified that, after the vessel had been raised, he visually inspected the No. 4 port fuel tank with a flashlight and found that the tank was covered with rust but did not find any cracks or holes.[1] Bartnett was not informed about the engine log references to water in the No. 4 port fuel tank. Bartnett testified that the fact that water was entering a fuel tank was significant and that, had he been informed of the engine log notations, he would have conducted definitive testing, such as filling the No. 2 port ballast tank with water and visually determining if there was any seepage from that tank into the No. 4 port fuel tank.

Likewise, the ABS surveyor, W.J. Robb, who found, after the February, 1983 inspection, that the general condition of the vessel was satisfactory, was not informed about the engine log references to water in the No. 4 port fuel tank. Robb did not view any of the tanks during his inspection of the vessel. Robb testified that, had he been informed of the engine log notations, he would have performed a thorough in-spection of the two tanks involved and probably would not have granted the six-month extension without further investigation and repairs to the tanks in question. In view of the substantial positive evidence in favor of the existence a crack and the inconclusive evidence against the existence of a crack, the Court finds that a crack between the No. 4 port fuel tank and the No. 2 port ballast tank did exist.

The uncontested evidence shows that Gulf Fleet managerial personnel had actual or constructive knowledge of the crack prior to the M/V GULF GALE departing the port of Corpus Christi. The engine logs were forwarded from the vessel to Gulf Fleet's office. In addition, both Captain Watkins and Leonard Pinder were told by Gulf Fleet's port engineer of a crack in the No. 4 port fuel tank located about three to four inches from the bottom of the tank. The Supreme Court has held that those corporate employees to whom privity or knowledge may be imputed to the vessel owner must be the "managing officers of the corporation," *Craig v. Continental Insurance Company*, 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886 (1891), which phrase has been interpreted to include port engineers, *Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro*, 159 F.2d 661 (2d Cir.1947), *cert. denied*, 331 U.S. 836, 67 S.Ct. 1519, 91 L.Ed. 1849; *Moran Towing & Transportation Co. v. The M/S HOPERANGE*, 226 F.Supp. 1018 (E.D.La.1964), *aff'd*, 345 F.2d 451 (5th Cir.1965). Thus, the port engineer's actual knowledge of the crack may be imputed to Gulf Fleet. In any event, Gulf Fleet could have ascertained the condition of the tanks in question if it had used reasonable diligence. *See Spencer Kellogg & Sons, Inc. v. Hicks*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932); *In the Matter of Patton-Tully Transportation Company*, 797 F.2d at 211. Gulf Fleet may not rely on the ABS certificate which granted the vessel a six-month extension because Gulf Fleet knew or should have known of the existence of the crack. *See United States Steamship Company v. U.S.*, 259

---

1. The Court notes that the posture of this case; wherein the defendant asserted limitation as a defense rather than petitioning for limitation, precluded plaintiffs from inspecting the vessel before repair.

F.2d 458 (9th Cir.1957), *cert. denied*, 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305 (1959).

■ Thus, the issue becomes whether the crack contributed to the sinking of the M/V GULF GALE. Plaintiffs contend that the crack caused the vessel to be unstable resulting in the port-stern list and allowed water to contaminate the fuel. Gulf Fleet bears the burden of showing that the crack did not contribute to the loss of the vessel. *See Matter of Texaco, Inc.*, 570 F.Supp. at 1278.

Prior to leaving Corpus Christi, the port engineer instructed Pinder to isolate the No. 4 port fuel tank. Accordingly, Pinder did not store any fuel in that tank. Plaintiffs' expert marine surveyors, Captains Ross and Knesel, testified that, assuming the best possible conditions, the isolation of the No. 4 port fuel tank created a negative free surface affect resulting in instability that would increase as fuel was consumed. Approximately ten days prior to the sinking, Pinder pumped water in the No. 2 port ballast tank. Water weighs more than fuel. On the evening of the sinking, the M/V GULF GALE developed a list to the port by the stern. The port-stern list was in the location of the No. 2 port ballast tank and the No. 4 port fuel tank. As discussed above, Gulf Fleet suggested that the list developed because of the blocked scuppers, but, in accordance with the Court's findings regarding the scuppers, the more plausible explanation is that the list developed as a result of the crack and resulting instability.

The evidence is uncontradicted that had the generators functioned, the engineer could have eliminated the list by pumping ballast and transferring fuel forward. The parties offered various theories to explain the failure of the generators, including water contamination of the fuel via the crack in the fuel tank and/or the gooseneck vents on deck, and a vacuum in the fuel line due to the list. If water is allowed to contaminate fuel, neither the generators nor the engines can function. The engines, which run on a gravity fuel system, will also shut down if the vessel is on a constant incline. In the instant case both generators and the port engine failed. The starboard engine did not fail, but was placed in neutral when the crew abandoned the ship. The crew engineer, Pinder, and Gulf Fleet's surveyor, Bartnett, testified that the generators failed due to a vacuum in the fuel lines in the day tank, created by the list of the vessel. Pinder based his conclusion on his past experience with generators. Bartnett based his conclusion on the fact that the engines showed no physical damage. He testified that combustion with water will cause physical damage to an engine, such as a broken cylinder. Plaintiffs' surveyor, Ross, testified that physical damage does not always result. Ross further testified that a vacuum will not occur at a fifteen degree list. It was Ross' conclusion that the generators failed due to combustion with water.

Pinder testified that when he pumped water into the No. 2 port ballast tank to level the boat, the water equalized from the ballast tank to the No. 4 port fuel tank through the crack in the bulkhead. Gulf Fleet contends that this equalization did not occur because examination of the vessel after salvage revealed that the bulkhead between the tanks in question was set forward approximately two inches. Bartnett testified that this phenomenon is commonly found on sunken vessels as a result of different pressures in different compartments and indicates that, at the time of the sinking, the No. 2 port ballast tank contained mostly water and the No. 4 port fuel tank contained mostly air. Had the water equalized between the two tanks, the pressure would have been equalized and no setting forward observed. However, as previously stated, Bartnett was unaware of the engine log references to a crack in the No. 4 port fuel tank. When informed of those notations at trial, he stated that he considered it a significant problem requiring more extensive testing than he performed. Based on the Court's previous finding that a crack existed and the substantial evidence that water was entering the No. 4 port fuel tank, the Court finds that, although there may not have been equalization, water did enter the No. 4 port fuel tank from the No. 2 port ballast tank

through the crack in the bulkhead. Thus, having found that the crack contributed to the list and that the crack permitted water to enter the fuel tank, the Court need not determine whether the generators failed due to combustion with water or to a vacuum, because, under either circumstance, the weight of the evidence is that the existence of the crack contributed to the failure of the generators and ultimately, the sinking of the vessel.

Plaintiffs contend that improper fuel and ballast vent check valves permitted water to enter the tanks. The fuel vents are located at a central location on the after bulkhead of the deckhouse. The height of the fuel vents is approximately eighty-four inches above the deck. The height of the ballast vents is thirty inches above deck. The ballast vents are located at various points around the vessel above the respective tanks. Each fuel and ballast vent is equipped with a ball check valve. Ball check valves insure that if water should come to the level of the vent pipe, the ball will float up and close off the opening of the vent.

Plaintiff, Ken Downey, testified, based on personal observation, that there were no balls in the gooseneck valves. Captain Watkins testified in his deposition that he believed the fuel had been contaminated by water which entered the fuel tanks through the gooseneck vents because there were no balls in the gooseneck valves. The Captain did not personally inspect the gooseneck vents. During the February, 1983 ABS survey, each of these vent pipes, both ballast and fuel, was checked by the ABS surveyor. No balls were missing. Subsequent to the raising of the vessel, Bartnett examined each of the gooseneck vents and visually observed each ball in place. Also, Bartnett observed all the balls after their removal from the vessel to determine if any had been crushed, broken, or required replacement. All balls were in good condition and reinstalled on the vessel. The Court finds that the weight of the evidence is that the gooseneck vents and ball check valves were in proper condition on the date of the sinking and therefore, did not constitute an unseaworthy condition.

The fact that one radar device was completely out and the other was malfunctioning did not contribute to the sinking. The only testimony on this issue was that of Captain Watkins, who testified that the radar problems had nothing to do with the sinking.

Regarding the inability of the Captain and engineer to do stability calculations, the Coast Guard's stability letter provided that information as to the stability of the vessel was not required to be kept on board because of the type and service of the vessel. Further, the Court finds that, even if the Captain and engineer knew how to perform stability calculations, it could not have prevented the sinking of the ship since the failure of the generators precluded transferring fuel or ballast to level the vessel.

Plaintiffs contend that the failure of Gulf Fleet to provide Captain Watkins with weather information and Gulf Fleet's order that the M/V GULF GALE leave the sea buoy and travel toward the tornado watch area contributed to the sinking of the M/V GULF GALE. The Court need not discuss these allegations of negligence because plaintiffs dismissed their Jones Act claim.

Finally, plaintiffs contend that the life raft on the M/V GULF GALE was unseaworthy, directly causing the injuries of plaintiffs, Zeringue and Eggleston. The uncontradicted testimony was that when the crew attempted to open the lift raft in the normal manner, a procedure which should only require fifteen pounds of pressure to inflate, the life raft failed to open. Zeringue's injuries occurred when he slipped on the deck of the vessel in his efforts to retrieve the unopened life raft. Eggleston was injured while assisting Zeringue. Eventually, the crew was able to inflate the life raft and escape from the sinking vessel. The life raft had last been inspected and serviced in January, 1981, approximately twenty-six months prior to the sinking of the vessel. Although Coast Guard regulations did not require a life raft aboard the M/V GULF GALE, having provided one, the uncontradicted testimony was that the life raft should have been inspected on an annual basis. Clearly, the condition of the life raft, in that it was last

inspected twenty-six months prior to the sinking and did not inflate quickly or easily, constituted an unseaworthy condition causing injury to plaintiffs, Zeringue and Eggleston. However, the unseaworthy condition of the life raft did not cause the vessel to sink. In order for an unseaworthy condition to set aside limitation, it must contribute to the sinking of the vessel. *See In the Matter of Texaco, Inc.*, 570 F.Supp. at 1278. The Court has reviewed *Walker v. Harris*, 335 F.2d 185 (5th Cir.1964), upon which plaintiffs rely for the proposition that an unseaworthy life raft which causes injury, but not the sinking of the vessel, can set aside limitation. Plaintiffs' interpretation of *Walker* is erroneous. The court's discussion in *Walker* of the unseaworthy life raft relates to the defendant's liability for the plaintiffs' injuries, not the setting aside of limitation. Thus, the unseaworthy condition of the life raft in the instant case cannot serve as a basis for denying limitation of liability.

In conclusion, I find that Gulf Fleet failed to establish its right to limit liability. Specifically, Gulf Fleet failed in its burden to show that the crack between the No. 2 port ballast tank and the No. 4 port fuel tank did not contribute to the sinking of the M/V GULF GALE and that it did not have privity or knowledge of that unseaworthy condition. Gulf Fleet is not entitled to limit its liability.