Louis MILLS, Appellant,

v.

MITSUBISHI SHIPPING COMPANY, Appellee.

No. 22045.

United States Court of Appeals Fifth Circuit.

March 16, 1966.

Rehearing Denied April 20, 1966.

Warner F. Brock, David J. Nagle, Houston, Tex., for appellant.

B. D. McKinney, Houston, Tex., Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel, for appellee.

Before BROWN and COLEMAN, Circuit Judges, and MORGAN, District Judge.

JOHN R. BROWN, Circuit Judge:

Another of the frequent longshoreman personal-injury damage claims against the vessel for unseaworthiness, this case reflects again the great utility of special interrogatories with a general charge under F.R.Civ.P. 49(a).[1] The serious question here is whether there was unseaworthiness as a matter of law. Concluding, as we do, that the specific jury finding of seaworthiness cannot be sustained, we are able to bring this case to an end without the waste of another trial. This is because the trial Court carefully constructed a charge with special interrogatories which would resolve the fact issues and thus enable that Court—or now the Appellate Court—by determining the legal significance thereof, to translate the verdict into the appropriate judgment. Had this all been wrapped up in the enigma of a general verdict for the defendant, no one would have been able to divine what—or how many—defensive theories the jury adopted. But as it is, the jury specifically found that plaintiff Mills was injured by the winch handle,[2] and that this caused identifiable money damages.[3] Since nothing else remains in dis-

1. We have but recently commented on this in American Oil Co. v. Hart, 5 Cir., 1966, 356 F.2d 657, p. 659, [Feb. 8, 1966] :

"By the use of interrogatories as a part of, and in conjunction with, a general charge, F.R.Civ.P. 49(a), a procedural device often having much appeal as the trial Court exercises its discretion in the choice of the manner of jury submission especially in complex areas of multiple claims-multiple parties, and the like, we know precisely what the jury found."

See, e. g., Vandercook & Son, Inc. v. Thorpe, 5 Cir., 1965, 344 F.2d 930, 931 n. 2; E. L. Cheeney Co. v. Gates, 5 Cir., 1965, 346 F.2d 197, 200, 204–205, 205 n. 14; Page v. St. Louis Southwestern Ry., 5 Cir., 1965, 349 F.2d 820, 824 n. 12; Nesmith v. Alford, 5 Cir., 1963, 318 F.2d 110, 125 n. 30, cert. denied, 1964, 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420; Duke v. Sun Oil Co., 5 Cir., 1963, 320 F.2d 853, 865 n. 19, on petition for rehearing, 323 F.2d 518, 519; Tugwell v. A. F. Klaveness & Co., 5 Cir., 1963, 320 F.2d 866, 868 n. 2 (extensive list of cases cited), cert. denied, 1964, 376 U.S. 951, 84 S.Ct. 967, 11 L.Ed.2d 970.

2. "Question No. 1:

Do you find * * * that the plaintiff, Louis Mills, was injured by his being knocked or jerked by a winch handle on the SS VIRGINIA MARU, on November 30, 1961?

ANSWER. We do."

3. "Question No. 8:

What amount of money * * * do you find * * * will fairly and reasonably compensate the plaintiff Mills for the injuries sustained by him on November 30, 1961?

You will answer by stating the amount in dollars and cents.

ANSWER: $4,000.00."

pute,[4] we reverse with directions to enter judgment.

The setting may be briefly sketched. At the time of the injury the plaintiff Mills was engaged as a longshoreman in loading cotton on the defendant's S.S. VIRGINIA MARU. As usual, he was employed by an independent contracting stevedore.

Mills was operating the high-boom winch. There were, as usual, two winches located on deck for this hatch. The inshore winch served the outrigger boom which was rigged so that it extended over the shipside to pick up cargo from the wharf. The second winch served the high boom, the top of which was over the square of the hatch. The sling of cargo was first lifted vertically by the outrigger winch until it cleared the ship's rail at which time the high-boom winch took in on the cargo fall to pull the cargo sling up and over the hatch. On receiving the proper signal, the operator of the high-boom winch lowered the cargo into the hold.

Although the shipowner seeks to insulate the jury verdict from critical scrutiny by emphasizing the confusion in the testimony of Mills and other non-seagoing witnesses in the description of the winches, its own evidence—and especially the photographs it sponsored and introduced—makes the mechanical setup clear.

The high-boom winch was steam powered. The operator, sitting on a wooden seat behind the winch, faced the hatch. The steam control valve was located on the operator's right, and it was actuated by rotating the horizontal bar handle to raise or lower the vertical screw valve stem. The control lever was on the operator's left. This lever was vertical and could be shifted in an arc forward and aft. The function of the lever was to engage and disengage the gears of the winch to select the direction in which the winch drum was to revolve. At its lower end the lever was, of course, connected to the gear mechanism.

Because there was simply no evidence that the winch was being improperly operated and, indeed, Mills was exonerated from charges of negligence (see note 4, supra), we think the exact sequence of operational steps is not significant. In executing this integrated movement of the cargo sling through two planes by means of the sequential and sometime simultaneous movement of both winches, the operator of the high-boom winch did several things. To lift and haul the sling up and over the hatch, the operator, using his right hand, opened the steam valve and with his left hand pushed the gear lever forward. When the load reached the desired height over the hatch, the lever was pulled back and the steam closed off. To lower, apparently the steam remained off and the lever was moved forward. The speed of the descending sling load could be altered by the use of a nearby foot brake or by opening the steam, or both.

Although Mills' credibility was badly shaken as to the exact mechanism of the bodily injuries, their disabling consequence, and the extent of his money loss, the fact of the occurrence—as the shipowner categorically concedes—is judicially established. (See notes 2 and 7, supra.) More than that, it was established without substantial contradiction from the testimony of numerous persons having the status of disinterested witnesses.

On Mills' testimony this was his version. He had taken a sling of three bales of cotton from the inshore winch and had squared them over the hatch. When he closed off the steam to lower them into the hold, the load immediately fell. At the same time he was jerked forward off the seat by the sudden movement of the brake lever which he had in his left hand. In attempting to pull the lever back, he was struck three or four times on the neck and chest by the lever as it whipped

---

4. The jury's answers exculpated the shipowner of negligence and the plaintiff Mills of contributory negligence. As we point out later, the finding of unavoidable accident falls with our determination of unseaworthiness.

**612**

back and forth.[5] The lever in some way made two sharp cuts in the chest area of the sweat shirt he was wearing. Mills ended up sprawled on the deck.

■ This occurrence was corroborated in several ways. Fellow longshoremen in the lower hold, naturally apprehensive when the three bales of cotton came crashing down, went topside, some in time to see that Mills had been injured and some in time to see the ship's crew working on the winch. Lee Hutton, the walking foreman near the hatch, was positive that he saw the load drop. Moreover, he immediately tried to operate the winch to ascertain the trouble. In so doing the lever also jerked and struck him in the shoulder though he suffered no serious injury. This testimony as to the occurrence was not eradicated by the unsuccessful efforts on cross-examination to get Hutton to equate this jerking with normal vibration of the lever handle,[6] nor by the impeachment as to the lever striking him.[7]

More important, the cause of the malfunction was soon discovered. Gardner, operating the outrigger winch, saw Mills fall back and exclaim about being hurt. After a member of the ship's crew was summoned, Gardner found a cotter key. Within a short time a work party from the ship's crew began working on the winch. By use of heavy hammers and other tools, this key was re-seated. However, it came out again and the repair crew redid the job. All of this we regard as established beyond question. The most that can be read into the deposition testimony of the Japanese Master, chief officer, and third mate is that they had no recollection of any such occurrence being reported or repair work being done.[8]

■ We think that the uncontradicted testimony showing the missing key, the replacement of it, the malfunction when it slipped out again, the second replacement of the key, and the untoward operation of the winch thereafter all adds

5. The shipowner introduced into evidence a statement by Mills to a compensation insurance claims investigator that the lever did not strike his shoulder but only strained it.

6. "Q. All of these handles vibrate some?
"A. To a certain extent. Depends on how old the winch is. Some of them will do that when you turn the steam on. It shakes you just like that from turning steam on. You have to hold it like that.
"Q. What you are saying is that this was an unusual thing, it was really going back and forth.
"A. Oh yes."

7. He earlier testified:
"Q. * * * Did you say that the lever actually hit you or just moved in your hand?
"A. It hit me. I had my hand on the lever and I turned that steam on and I couldn't hold it after I turned the steam on and it was just like that quick. When you turn that steam on, the lever would go just like that."
After Hutton denied that he had told "people before that it didn't actually hit * * * [me] on the shoulder, but that it went back and forth a great deal in * * * [my] hand and * * * [I] had to turn it loose," the shipowner in-

troduced Hutton's statement presumably given to an investigator. In it he made no mention of being struck by the lever on his shoulder but said "* * * I turned the steam on and the lever jerked and I couldn't hold it."
Of course, we recognize that the shipowner's introduction of prior inconsistent statements by Mills (note 5, supra) and Hutton for impeachment purposes could have permitted the jury to reject all or part of the testimony of these witnesses. This could have included that relating to the occurrence itself the asserted deficiencies in the winch, its operation, etc. So our holding does not imply that the trial Court erred in jury submission as to all such matters. But our view of this case must necessarily be from the post-verdict standpoint of the trial Judge ruling on Mills' motion for judgment n.o.v., and the jury having found that Mills was injured by his being knocked or jerked by the winch handle (notes 2 and 3, supra), such pre-verdict questions of credibility were washed out.

8. The deposition revealed that an oiler is on deck for winch servicing and repairs, and that the work would be done by the oiler under the supervision of an engineer officer. No deposition of either, even if taken, were offered.

up to failure from an identifiable cause of ship's gear during normal expected operations. But the result is the same even if, for want of adequate connecting evidence, the key is disregarded as the causative factor. In either case, the winch while under normal, expected use, with no proof that it was either being mishandled, abused or operated improperly, failed to perform the function for which it existed.

This is the classic case of unseaworthiness, a concept which has been phrased in a number of ways. Thus, in a marine insurance situation we stated: "Of course, a defect in machinery or a defect in a hull means that the vessel is thereby unseaworthy since, with such defect, the machinery or hull, cannot comply with the classic definition of 'reasonably suitable' for the purposes intended." Tropical Marine Prod., Inc. v. Birmingham Fire Ins. Co., 5 Cir., 1957, 247 F.2d 116, 120. In a death-injury situation we spelled it out in terms of matching operating proficiency against anticipated operating conditions:

"The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: what is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny, sufficient to withstand those anticipated forces? If the answer is in the affirmative, the vessel (or its fitting) is seaworthy. If the answer is in the negative, then the vessel (or the fitting) is unseaworthy no matter how diligent, careful, or prudent the owner might have been. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 AMC 1503." Walker v. Harris, 5 Cir., 1964, 335 F.2d 185, 191, cert. denied, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342.

Along the same line is Ferrante v. Swedish Am. Lines, 3 Cir., 1964, 331 F.2d 571, 576, cert. dism'd, 379 U.S. 801, 85 S.Ct. 10, 13 L.Ed.2d 20. So, too, is the Supreme Court's recent reiteration in a Ryan [Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133] indemnity situation of the principle that the "shipowner is liable to the employees of the stevedore company as well as its employees for failing to supply a vessel and equipment free of defects." Italia Societa, etc. v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732, 740.

Of course, Trawler Racer disclaims any purpose " * * * to suggest that the owner is obligated to furnish an accident-free ship." Rather, the Court goes on to emphasize:

"The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941, 948.

But under no stretch of the imagination is a winch with shift lever reasonably fit if, at a critical point in the handling of the draft, the lever shakes so violently that the operator is thrown off the seat, is injured, cannot control the load, or all three. Nor is this nascent unseaworthiness extinguished by suggesting, as the shipowner does, that with the lever suddenly jerking, the operator might have overcome the consequences by use of the foot brake, turning the steam on, or both.[9] For behind the absolute duty to furnish a seaworthy ship and appliances is the law's policy that the way to avoid injury from misjudgment in the *in extremis* response is to eliminate the deficiencies which give rise to such emergencies.

What we do here, as what we did in Walker v. Harris, supra, is not at

9. As a fact issue, not a justification as a matter of law, this washed out by the finding exonerating Mills of negligence (see note 4, supra).

odds with our decision in Jefferson v. Taiyo Katun, K.K., nor the comment that "it [must] be a rare case where the issue of *unseaworthiness as the proximate cause* of an injury is to be resolved * * against a shipowner as a matter of law," 5 Cir., 1962, 310 F.2d 582, 583, cert. denied, 1963, 372 U.S. 967, 83 S.Ct. 1091, 10 L.Ed.2d 130. (Emphasis added.) Rare or not, unseaworthiness is not always a fact issue. The seaman-longshoreman may never get beyond a motion for summary judgment. McQuiston v. Freighters & Tankers S.S. Co., 5 Cir., 1964, 327 F.2d 746. On the other hand, in other cases such as Walker v. Harris, supra, the trier's finding of unseaworthiness must be reversed as a matter of law. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 1962, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798, neither suggests nor compels a different result. Actually the problem there was the erroneous effort of the Court of Appeals to reconcile apparently conflicting special interrogatories. Here there is no inconsistency. To the contrary, we disregard the finding of seaworthiness [10] because the facts show unseaworthiness as a matter of law.

■ ■ This leaves only the finding that Mills' injuries "were the result of an unavoidable accident." Its presence is a sharp reminder of the confusion resulting from the importation of this essentially Texas device leading to discountenance of its use in FELA and federally created maritime claims. Page v. St. Louis Southwestern Ry., 5 Cir., 1963, 312 F.2d 84, 93, 98 A.L.R.2d 639. Of lumping sole proximate cause with unavoidable accident, we said on the second go-round in Page:

"[W]e deem it a matter of good judicial administration to point out now,

as we did formerly on unavoidable accident, that ordinarily in FELA cases there is really no place for this issue in the jury submission as such. All of these collateral devices so dear to the heart of Texas bred and Texas trained lawyers immersed in its complex system of special issues submission are in reality merely a submission in another form of questions already implicit in the basic ones of the (a) Railroad's negligence, (b) causation by reason of the Railroad's negligence, (c) the injured worker's negligence, (d) causation by reason of the worker's negligence, and (e) the percentage reduction of damages." Page v. St. Louis Southwestern Ry., 5 Cir., 1965, 349 F.2d 820, 826.

And certainly it was so here. For apart from the general instruction that the happening of an occurrence does not necessarily establish negligence [11] (see Page II, 349 F.2d at 825), the definition of an unavoidable accident as "an * * * event or occurrence, happening suddenly * * * not proximately caused by any unseaworthy condition of the vessel or her appurtenances," served only "to cross examine the jury," Page II, 349 F.2d at 826, as to a matter already submitted in a different form. The pudding's eating proof is that our holding of unseaworthiness as a matter of law automatically destroys the finding of unavoidable accident pursuant to this definitional instruction.

Since the trial Court should have granted Mills' motion for judgment n. o. v. pursuant to Rule 50(b), the cause must therefore be reversed and remanded with directions to enter judgment for Mills.

Reversed and remanded.

---

10. Since liability follows from this judicially declared unseaworthiness, the exculpatory finding of no negligence becomes immaterial.

11. In the charge on unavoidable accident, the Court stated: "The law recognizes that a vessel may be in every respect seaworthy and neither the plaintiff nor the defendant may have been at fault in any respect, and yet an accident may occur."