378 F.2d 193
 John L. MARSHALL, Appellant,
v.
OVE SKOU REDERI A/S, and the SS BIRGITTE SKOU, her engines, hull, tackle, cargo and appurtenances thereof, Appellees,
The Travelers Insurance Company, Intervenor.
 No. 23295.
 United States Court of Appeals Fifth Circuit.
 May 15, 1967.
 
 Ross Diamond, Jr., Mobile, Ala., for appellant.
 Alex T. Howard, Jr., W. Boyd Reeves, Mobile, Ala., for intervenor, McCorvey, Turner, Johnstone, Adams & May, Mobile, Ala., of counsel.
 Before RIVES, GEWIN and GODBOLD, Circuit Judges.
 GODBOLD, Circuit Judge.
 
 
 1
 Appellant John L. Marshall, a longshoreman, filed a libel against the SS Birgitte Skou and her owner[1] to recover damages for personal injuries sustained on board the vessel during loading of cargo at Mobile. The United States District Court for the Southern District of Alabama found that the equipment used in the loading operation was not shown to be unseaworthy.
 
 
 2
 Marshall, an employee of a stevedoring company, was a member of a gang loading structural steel of varying size, shapes and weights into a hold of the ship by derrick. He was hurt in the loading of a painted steel H-beam or I-beam, measuring approximately 2 feet by 1½ feet by 40 feet and weighing 2 to 2½ tons. Its length was such that it could not be brought into the hold in a horizontal position, so it was picked up at an angle of 40° to 60° and "dived" into the hold at that angle. When it was in position over the hold and the winch reversed the beam fell from the cargo sling into the hold and struck another beam. Marshall, who was standing on the struck beam but under the bulkhead rather than underneath the hold opening, was thrown into the air by the impact, injuring his right ankle joint.
 
 
 3
 There were no allegations of negligence. The sole issue was seaworthiness of the cargo sling.
 
 
 4
 The sling consisted of two straps leading off a single ring, the first five to six feet of each made of wire cable and the last six or eight feet of steel chain. A hook was attached to the free end of each chain. The angular position of the beam for descent into the hold was effected by wrapping one chain twice around one end of the beam and carrying its hook back to the chain, and taking a single turn of the second chain at the other end and connecting its hook back to the chain. The derricks of the vessel were rigged at such angle that the load could be brought in without striking any part of the vessel.
 
 
 5
 Appellant claimed unseaworthiness in two respects: (1) That the chain straps used to form the sling were not fit and suitable for the job to be performed. There was no contention that the chains were defectively manufactured or deteriorated or that they broke in use. (2) That wood chocks or dunnage should have been available and used between the chains and the load to help create traction.
 
 
 6
 All the evidence was that the gear other than the sling was in good order and properly used and operated and the load which fell was not jerked or mishandled. There was no evidence of external force striking the beam in the process of its descent, nor evidence of negligence on the part of the crane operator or any of the other participants active in the loading operation.
 
 
 7
 Earlier in the day, and after the accident also, beams of the same general size and type were loaded in the same manner without falling from the sling; some smaller pieces of steel that were handled several pieces to a load had fallen prior to the accident.1a Since the accident (March, 1964) and to the time of trial (August, 1965) the same chain straps were in use loading steel onto other ships without incident; whether these operations involved "diving" the steel into the hold does not appear.
 
 
 8
 On the record the finding of fact by the trial court that the use of a chain sling was customary is not clearly erroneous. This leaves us with the problem whether under the undisputed evidence the chain sling, in the circumstances of this case, was unseaworthy as a matter of law. Walker v. Harris, 335 F.2d 185 (5th Cir.), cert. denied, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964); Mills v. Mitsubishi Shipping Company, 358 F.2d 609 (5th Cir., 1966). We conclude it was unseaworthy and remand for assessment of damages.
 
 
 9
 The owner owes an absolute and non-delegable duty to provide a seaworthy vessel for the libelant working as a longshoreman thereon; however, the absolute duty is only to furnish a vessel and equipment reasonably safe and fit for the purposes of intended use, and reasonably adequate to the place and occasion where used by direction of the owners.[2]
 
 
 10
 An improper method of handling cargo can amount to unseaworthiness.[3]
 
 
 11
 The courts have struggled to supply and put to use meaningful criteria to determine seaworthiness, tossed between the horns of liability without fault and fitness of a sufficiently high standard that the shipowner is relieved of liability.[4] Seaworthiness is a relative concept, depending in each instance upon the circumstances in which fitness is drawn into question.[5]
 
 
 12
 In Vickers v. Tumey, 290 F.2d 426, 433, n. 5 (5th Cir. 1961) this Circuit approved this definition of seaworthiness: "Seaworthy * * * means that under the circumstances existing at the time of the injury, the vessel and her equipment * * * were reasonably fit to perform the duty of safety, which this vessel owed to human beings aboard her, and to perform duties for which they were intended."
 
 
 13
 Reasonable suitability of ship and equipment is spelled out in terms of matching operating proficiency against anticipated operating conditions. Mills v. Mitsubishi Shipping Company, supra. The test is phrased as follows in Walker v. Harris, supra, 335 F.2d at 191:
 
 
 14
 "The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: What is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny, sufficient to withstand those anticipated forces? If the answer is in the affirmative, the vessel (or its fitting) is seaworthy. If the answer is in the negative, then the vessel (or the fitting) is unseaworthy no matter how diligent, careful, or prudent the owner might have been. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 AMC 1503."
 
 
 15
 The courts are, in the end, attempting to determine whether the seaman may perform his task aboard the ship with reasonable safety. Sanford v. Caswell, 200 F.2d 830, 832 (5th Cir.) cert. denied, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1136 (1953); Lester v. United States, 234 F.2d 625 (2d Cir.) cert. granted, 352 U.S. 889, 77 S.Ct. 130, 1 L.Ed.2d 85 (1956), appeal dismissed, 352 U.S. 983, 77 S.Ct. 384, 1 L.Ed.2d 366 (1957); Walker v. Sinclair Refining Co., supra.
 
 
 16
 Articulating criteria to determine seaworthiness requires use of the language of negligence.[6] In the language of Walker v. Harris, supra, "* * * What is the [gear] to do? What are the hazards, the perils, the forces likely to be incurred," or, in the language of Mills, what are the "anticipated operating conditions." The force and hazard to be incurred — single, obvious and great — by this cargo sling was the simple one of the force of gravity (or an external force, blow or mishandling) which, unless guarded against by operating proficiency, would cause the tilted beam to slip from the sling and fall and hurt someone. The force was not guarded against by shipowner's gear, and libelant was injured.
 
 
 17
 The operational forces the sling was to incur were known. There is no problem whether shipowner should or should not have anticipated or acted upon the degree of likelihood that certain forces and hazards might occur, such as storms which might be conceivable but not reasonably anticipable, or perils of the sea that are imaginable but not normally foreseeable. Mitchell v. Trawler Racer, supra.
 
 
 18
 In many loading operations the forces and hazards to be incurred by the gear include the possibility of application of conditions and forces other than those inherent to the properly conducted movement itself — the winch may jerk or suddenly stop and cause the sling to lose its draft of cargo, or the sling may be struck against a hatch. See Smith v. M/V Gisna, 362 F.2d 164 (5th Cir., 1966). A new agent may be introduced, as the slime in Trawler Racer or the apple peel in Poignant v. United States, 225 F.2d 595 (2d Cir., 1955), giving rise to "transitory unseaworthiness." But this accident occurred under the most antiseptic conditions possible. The winch was operated properly. The load struck nothing. The sling did not break. No new agency affected the sling. The loading operation was done without negligence. The sling simply did not perform its single assigned purpose of retaining the load without dropping it while moving it from point A to point B.
 
 
 19
 We turn to the effect of a sling that will not hold its draft upon the reasonable safety of the longshoreman's place of work. The effect in this case was a significant one, considering the size, weight, and bulk of the item carried, and the possibility of death or serious injury to those working underneath it as it was lifted into the air, moved and set down.
 
 
 20
 In addition, there was no place of safety to which the longshoremen could go. The libelant, who had retreated to the forward end of the hold when the gangway man shouted a warning and was not underneath the square of the hatch, was nevertheless injured by the movement of beams already in the hold when they were struck by the falling beam.
 
 
 21
 Other circumstances will bring different results. In Phipps v. N. V. Nederlandsche Amerikaansche, S.M., 250 F.2d 143 (9th Cir., 1958) the load in draft was, comparatively speaking, lighter and smaller, consisting of bundles of 3" x 6" timbers up to 40 feet long, and libelant had a place of safety to which to go and a warning of "heads up" with each load. In Smith v. M/V Gisna, supra, the sling carrying rolls of newsprint struck the hatch coaming and the load popped out of the sling; the opinion does not reveal the extent to which this application of a force not inherent in the movement itself could be expected as part of the range of peril to be guarded against.
 
 
 22
 The gear was put to its primary use. Operational proficiency to meet expected forces needs to respond more clearly to the demands of primary use than to those of incidental use. Ordinarily failure of gear to perform will have its greatest impact upon the seaman's safety when he is deprived of the primary use, as a life raft which will not float, a steam valve which will not hold steam, or a cargo sling which will not retain its load.
 
 
 23
 Under the undisputed facts, the cargo sling failed to perform the purpose for which intended, while being used in a proper manner and for exactly the purpose intended, and affected only by forces and hazards known to the libelee and against which the sling did not protect, and these conditions seriously affected the safety of libelant's place to work — then the sling was not seaworthy. As this Court said in Mills:
 
 
 24
 "But under no stretch of the imagination is a winch with shift lever reasonably fit if, at a critical point in the handling of the draft, the lever shakes so violently that the operator is thrown off the seat, is injured, cannot control the load, or all three."[7]
 
 
 25
 This case is akin to Van Carpals v. The S.S. American Harvester, 297 F.2d 9 (2d Cir.) cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 84 (1962). Libelant removed the bonnet from a steam valve and was burned by steam and hot water which gushed out under circumstances where the valve should have retained them. The District Court dismissed the libel on the ground of "unexplained accident." The Court of Appeals reversed, holding the valve unseaworthy as a matter of law, saying:
 
 
 26
 "We disagree and hold that under prevailing law the vessel must be held unseaworthy. Though the cause of the accident may be inexplicable, yet it, and the way it occurred, demonstrated that the valve was actually not in a safe condition for the work needed to be done upon it. The trial court believed that the independent tests made to double check the gauges and the fact that libelant saw no signs of pressure negated an unseaworthy condition. But we do not think that follows. The accident occurred; there was steam in the valve; and it erupted. These conceded physical facts imperatively required a finding of unfitness for the task in hand. Thus a conclusion of unseaworthiness should have been reached irrespective of the proofs tending to absolve the owner of negligence."
 
 
 27
 * * * * * *
 
 
 28
 "Under the circumstances here disclosed of substantial injury from a failure of the ship's machinery, which demonstrates that it was unfit for its intended use, the breach of duty is clear."
 
 
 29
 It remanded the case for fixing of damages.
 
 
 30
 The steam valve, like the sling, did not perform its assigned function in the face of the exact forces it was intended and designed to encounter. A previous check on the steam line which showed no pressure, while obviating negligence, did not insulate the libelee from liability for the unseaworthy condition.[8]
 
 
 31
 Judge Dyer of this Court, while a District Judge, followed Van Carpals in In Re Read's Petition, 224 F.Supp. 241 (S.D.Fla., 1963). A winch was cranked to take in a sail, and when the operation was completed failed to hold its position and spun; the spinning crank struck libelant. No defect was shown. Judge Dyer held it unseaworthy.
 
 
 32
 In Wm. Johnson and Company v. Johansen, 86 F. 886 (5th Cir., 1898), the owner furnished two pieces of gear neither of which was unsound or deteriorated, a toggle and new, stiff and cumbersome rope, to rig a boatswain's chair on the mast. When used in combination the rope would not grip or bind sufficiently to hold the toggle nor would the half hitches and turns made around the toggle hold. The boatswain's chair fell with libelant in it. This Circuit, resting on negligence, a narrower scope of liability than unseaworthiness, held the owner liable.
 
 
 33
 In Texas Menhaden, Van Carpals, Read and Johnson there was not shown to be a defect in the sense of a broken piece, stump or frayed end. In considering whether the owner has departed sufficiently far from conditions of absolute safety for the person and the place to work of the seaman that he is to be held liable for resulting injury, liability does not turn on particular modes or manners of departure from safety. Improper design or insufficient capacity can be as deadly as a broken or missing part. The seaman working underneath a cargo sling which will not hold its load is in a situation as unsafe as underneath a sling having a broken hook on the chain.8a
 
 
 34
 In Vega v. The Malula, 291 F.2d 415 (5th Cir., 1961) a sheave came out of a block when a pin unaccountably slipped out. This Court held:
 
 
 35
 "The event occurred. The block failed. The block failed while being used for a normal expected purpose. That is, and has been, at least since Sierazki [sic] in 1947, a classic case of patent unseaworthiness. The passage of time has but made the warranty of seaworthiness more awesome as it extends to gear used without regard to ownership and to transitory conditions. [Citations]. How the pin happened to slip out is of no real legal significance. No matter how much care was used either by the owner, the ship's crew, or the deceased crew member immediately responsible for its maintenance, the failure of the block under normal expected use visits on the vessel owner an unremitting liability based on the breach of the absolute duty." (Emphasis added.)
 
 
 36
 See also Alaska Steamship v. Petterson, 205 F.2d 478 (9th Cir.) affirmed per curiam, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1953). A block broke. There was no proof it was defective, or even of its condition before the accident. The court applied a doctrine stated to be similar to res ipsa loquitur: "If the block was being put to a proper use in a proper manner, as found by the district judge, it is a logical inference that it would not have broken unless it was defective — that is, unless it was unseaworthy."
 
 
 37
 In the case before us the District Court found the equipment used was customary in this operation and that the proof did not show what was customary was not reasonable, citing Phipps, supra.[9] The general practice of the industry, while pertinent, is not the measure of prudence. "[The industry] never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." Judge Learned Hand in The T. J. Hooper, 60 F.2d 737, 740 (2d Cir., 1932).
 
 
 38
 While developing the testimony of customary gear both parties went fully into whether the sling should have been made of cables as contended by libelant, or of chains as claimed by shipowner. Whether shipowner should have used a better or safer appliance or gear is not the real question, but whether under all the circumstances the slings used were reasonably safe. Doucette v. Vincent, supra. The emphasis in testimony and decree on chains vs. cable (and use vs. non-use of chocks) indicates that parties and Court tended to consider the case governed by a choice between them. This is a misconception. Even if the Court had thought cables the best the shipowner had no duty to supply the best, or the most modern, or perfect gear, so long as reasonably suitable. Doucette v. Vincent, supra; Manhat v. United States, 220 F.2d 143 (2d Cir.), cert. denied, 349 U.S. 966, 99 L.Ed. 1288, 75 S.Ct. 900 (1955). That a cable sling was not determined the best, and that a chain sling was determined customary, do not of themselves make the chain sling seaworthy. Neither injured seamen nor courts are required to supply the design for gear sufficient to carry out its primary and assigned function without undue risk.
 
 
 39
 Prior and subsequent safe operation of gear was evidence whether the gear was reasonably fit for the use intended under the instant circumstances, but does not alone determine the gear seaworthy; were that so there never could be liability for "transitory unseaworthiness".9a
 
 
 40
 The owner is not obligated to furnish an accident-free ship. But the maxim proves little here.
 
 
 41
 "It thus appears clear to us that the shipowner cannot wipe out this `absolute' duty by saying that he does not know what caused the particular accident or suggesting in effect that it was an act of God." Van Carpals v. The S.S. American Harvester, supra, 297 F.2d at 11.
 
 
 42
 In any event, the injury to libelant did not occur from an unascertained cause or an act of God. The testimony, and the findings of the District Court, exclude all hypotheses of cause other than failure of the sling to perform its function.
 
 
 43
 The standards here articulated and applied do not make the owner an insurer or a guarantor against accidents in general, nor in particular against accidents while loading and unloading or accidents for which there is no exculpatory explanation. There are many relevant and limiting factors to be considered in weighing whether unseaworthiness exists. For example, the hazards may be unknown or not sufficiently foreseeable. The equipment may not be in use to perform its primary function or not in normal use. The hazard may not be sufficiently great that the departure from conditions of absolute safety is enough to impose liability. Failure may be caused or contributed to by external forces and the likelihood of their presence too slight. The standards and customs of the industry are pertinent, though like each other factor, not necessarily conclusive.
 
 
 44
 The present case is of failure of equipment to carry out its assigned function while in normal use in a situation of high and known hazard and without the effect of any external force or event. On this record the equipment is unseaworthy, and custom does not suffice to insulate the owner from responsibility.
 
 
 45
 Reversed and remanded for determination of damages.
 
 
 
 Notes:
 
 
 [1]
 The stevedore (Cooper Stevedoring Company) was impleaded and its insurer (Travelers Insurance Company) intervened. The impleading petition was subsequently dismissed on motion of the ship, but the stevedore's insurer remains in the action
 1a. All the steel was bridge, or structural, steel. The 40 foot I-beams were for uprights, the shorter pieces for frames, in bridgework. The shorter pieces were described as "some ten feet and all like that." They slipped from the sling though loaded on a level plane instead of dived in. Obviously these pieces too had the capacity to maim or kill.
 
 
 [2]
 Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962); Texas Menhaden Company v. Johnson, 332 F.2d 527 (5th Cir., 1964); Walker v. Harris, supra; Nunes v. Farrell Lines, 227 F.2d 619 (1st Cir., 1955); Doucette v. Vincent, 194 F.2d 834 (1st Cir., 1952)
 
 
 [3]
 Morales v. City of Galveston, supra; Blassingill v. Waterman Steamship Corp., 336 F.2d 367 (9th Cir., 1964); Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457 (4th Cir.) cert. denied, 376 U.S. 970, 84 S.Ct. 1136, 12 L.Ed.2d 84 (1964). Cf. Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (2nd Cir., 1950)
 
 
 [4]
 "Unseaworthiness appears an unsatisfactory guide to conduct; it merely states the conclusion that under certain circumstances an injured seaman may recover from the shipowner." Note, The Doctrine of Unseaworthiness in the Lower Federal Courts, 76 Harv.L.Rev. 819, 829 (1963)
 
 
 [5]
 Walker v. Harris, supra, 335 F.2d at 191; Walker v. Sinclair Refining Co., 320 F.2d 302 (3rd Cir., 1963); Shenker v. United States v. American Stevedores, 322 F.2d 622 (2d Cir. 1963), cert. denied, 376 U.S. 907, 84 S.Ct. 659, 11 L.Ed.2d 606 (1964)
 
 
 [6]
 As the concept of seaworthiness has developed, this use — in a field of liability without fault — of words commonly applied to negligence actions, has vexed the courts
 In Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), a case of "transitory unseaworthiness," the Supreme Court rejected the test the Second Circuit had applied of "reasonable care under the circumstances," saying: "[There] is a complete divorcement of unseaworthiness liability from concepts of negligence. To hold otherwise now would be to erase more than just a page of history." 362 U.S. at 549, 80 S.Ct. at 933. However, Trawler Racer's own standards, paraphrased in Walker v. Harris, above, for determining seaworthiness necessarily embrace phraseology and analyses that concurrently exist in negligence law. The Supreme Court recognized this in Morales, supra: "[W]hat caused the injury in the present case * * * [w]as not the ship, its appurtenances, or its crew, but the isolated and completely unforeseeable introduction of a noxious agent from without." 370 U.S. at 171, 82 S.Ct. at 1230. The thrust of the dissent also in Morales is also in terms of foreseeability.
 In Walker v. Harris, supra, this Court too followed negligence approaches: "The question in this case boils down then to whether winds and seas of the kind actually encountered at this fateful moment were reasonably to be anticipated." * * * "[T]he familiar doctrine, so often invoked where vessels sink in calm waters, that sinking (of other failure) under circumstances and conditions which the vessel must reasonably anticipate and overcome is the best proof of, and makes out the classic case of, unseaworthiness." 335 F.2d at 191, 193.
 The answer we think is that if there is present a condition which is found to constitute unseaworthiness the carrier's care, or lack of it, has no play in insulating him from liability, or mitigating his fault, but in the initial determination — answering the threshold question whether the condition is unseaworthy as not reasonably fit — the court necessarily employs methods of analysis, and language, concurrently used in negligence cases. Some commentators propose adoption of negligence concepts into seaworthiness as a specific limitation on the expanding scope of the shipowner's liability for unseaworthiness. See The Supreme Court, 1961 Term, 76 Harv.L.Rev. 78, 93-95; Comment, Expanding the Warranty of Seaworthiness: Social Welfare or Maritime Disaster, 9 Vill.L.Rev. 422 (1964). Cf. Note, Risk Distribution and Unseaworthiness, 75 Yale L.J. 1174 (1966).
 Distinctions which in common sense are relevant to a determination of seaworthiness do not become irrelevant because they are relevant also to negligence. Determining perils and forces that gear must reasonably be expected to encounter concerns foreseeability of likelihood of future events. Operating proficiency cannot be measured without regard to expected forces. "The lack of a hand rail may make a vessel sailing on the high seas unseaworthy while the lack of such a rail in a harbor boat operating in protected waters where hawsers are used in moving her about does not constitute unseaworthiness." 2 Norris, The Law of Seamen, § 612 (1962).
 The nature and extent of the infringement which forces and hazards, as limited by operating proficiency, may have on the safety of the seaman and his place to work necessarily embrace consideration of the extent of risk of bodily harm. Broken glass on the rail of a fishing boat from normal operation is a clearer case of departure from reasonable fitness than slime on the same rail from normal operation. We do not, by referring to the usefulness of the methods of analysis and the language of negligence, imply that seaworthiness is to be limited to the confines of negligence as proposed by the law review commentators noted above, or that these analyses occupy the whole field of analysis, only that they are useful tools. See the discussion in Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457 (4th Cir., 1963) where it was held error to repeatedly emphasize in the jury charge the words "reasonable", "reasonably" and "unreasonable" to such extent that they de-emphasized the affirmative aspects of seaworthiness and "diluted and adulterated the character of the warranty of seaworthiness" and were tantamount to suggesting that the jury must find negligence in order to hold the owner liable.
 
 
 [7]
 See also Texas Menhaden Company v. Johnson, 332 F.2d 527 (5th Cir., 1964). A seaman was injured when a crane suddenly bent in the middle and an attached line forced his hand against a spool. Affirming a finding that the crane was unseaworthy, this court commented: "[I]t is settled law that failure of a piece of equipment under proper and expected use is a sufficient predicate for a finding of unseaworthiness." 332 F.2d at 528
 
 
 [8]
 The present case is analogous to unexplained sinking of a ship in calm waters under conditions that reasonably should be anticipated (here, known conditions), which makes out a "classic case of unseaworthiness." Walker v. Harris, supra. Elsewhere this is referred to as a "presumption of unseaworthiness." Tropical Marine Products, Inc., v. Birmingham Fire Insurance Company, 247 F.2d 116 (5th Cir.) cert. denied, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957)
 8a. See Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967), discussing unseaworthiness arising from assignment of too few crewmen to perform a particular task (uncoiling and moving a heavy rope). In considering whether principles relating to equipment and gear should be applied to personnel the Court recognizes that insufficient gear is a source of liability just as defective gear.
 "As regards equipment, the classic case of unseaworthiness arises when the vessel is either insufficiently or defectively equipped."
 * * * * * * *
 "[U]nder Mahnich [v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561] it makes no difference that respondent's vessel was fully manned or that there was a sufficient complement of seamen engaged in the overall docking operation, for there were too few men assigned `when and where' the job of uncoiling the rope was to be done. [Footnote omitted.] And under Crumady [v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413] it makes no difference that the third mate and two men he assigned to perform the job were themselves competent seamen, or that the rope was itself a sound piece of gear. By assigning too few men to uncoil and carry the heavy rope, the mate caused both the men and the rope to be misused.
 "This analysis, we believe, is required by a clear recognition of the needs of the seaman for protection from dangerous conditions beyond his control and the role of the unseaworthiness doctrine which, by shifting the risk to the shipowner, provides that protection. If petitioner had been ordered to use a defective pully in lifting the rope, he would clearly be protected by the doctrine of unseaworthiness. If the pulley itself were sound but petitioner had been ordered to load too much rope on it, he would likewise be protected. If four men had been assigned to uncoil the rope but two of the men lacked the strength of ordinary efficient seamen, petitioner would again be protected. Should this protection be denied merely because the shipowner, instead of supplying petitioner with unsafe gear, insufficient gear, or incompetent manual assistance, assigned him insufficient manual assistance? We think not. * * *"
 
 
 [9]
 Much of the testimony of other loading operations related to handling steel of smaller sizes and weights, sometimes in bundles, and much of it was silent on whether the loads were slung parallel to the surface or tilted to "dive" them into the hold. We do not find clearly erroneous the factual holdings of the court that the chain sling is customary; we find only that on the undisputed facts it did not attain the standards of seaworthiness
 9a. Hroncich v. American President Lines, Ltd., 334 F.2d 282 (3rd Cir., 1964).
 
 
 RIVES, Circuit Judge (concurring):
 
 46
 This case is close on its facts to our recent decision in Smith v. M/V Gisna, 5 Cir. 1966, 362 F.2d 164, where we affirmed under the clearly erroneous scope of review. In that case, however, the accident occurred when the load or the sling used in the loading operation struck the coaming thereby releasing the rolls of newsprint. That occurrence could be explained by the failure of the two winchmen to work together in properly lowering the load. In the present case the district judge found that there was no evidence of negligence on the part of the crane operator. There appears to be no evidence of negligence of any of the longshoremen in the steepness of the angle at which the beam was placed for loading or otherwise. Compare Ferrante v. Swedish American Lines, 3 Cir. 1964, 331 F.2d 571. There is simply no explanation for the accident, except either the choice of an improper method of loading[1] or the unfitness of the sling used to lower the beam. Under the principles established in the Second Circuit and in this Circuit,[2] I agree that the necessary conclusion is that unseaworthiness of the ship caused the injury to Marshall. I therefore concur.
 
 
 
 Notes:
 
 
 [1]
 Which would amount to unseaworthiness. See cases cited in footnote 3 to opinion
 
 
 [2]
 Van Carpals v. The SS American Harvester, 2 Cir. 1961, 297 F.2d 9; Walker v. Harris, 5 Cir. 1964, 355 F.2d 185; Mills v. Mitsubishi Shipping Co., 5 Cir. 1966, 358 F.2d 609
 
 
 GEWIN, Circuit Judge (dissenting):
 
 47
 Admittedly this is an appealing case in which to find some theory by which the libelant can recover for injuries sustained during what, in the normal course of events, should have been a routine and incident free loading operation. That the injuries resulted from the failure of a cargo sling to hold its cargo makes the libelant's case all the more attractive. Nevertheless, on the basis of the district court's findings and the record before us, I am unable to join in the conclusion of the majority that as a matter of law the use of chain slings rendered the ship unseaworthy. In reaching that conclusion the majority fails to take cognizance of the vital factual differences which distinguish this case from those upon which it relies. Its decision is tantamount to holding that if an accident occurs which can not be satisfactorily attributed to an exculpatory cause, the ship is unseaworthy as a matter of law. While disclaiming that it is establishing such a standard, the very factors which it contends limit the scope of the rationale are in themselves exculpatory causes or explanations. Such a result is not sanctioned by decisional law and, in my opinion, renders a shipowner a virtual insurer or guarantor of the safety of seamen employed on its vessel in all circumstances. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed. 2d 941, 948-949 (1960); Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962).
 
 
 48
 The majority recognizes that "* * * the defendant had no duty to supply the best, or the most modern, or perfect gear, so long as reasonably suitable." Nevertheless, it is concluded that because the sling in question failed to perform its assigned task on the occasion in question the ship was unseaworthy. Thus, the majority has decided that the district court was clearly erroneous when it found, admittedly by implication, that the sling was reasonably fit for its intended purposes. In support of its position, the opinion relies upon several cases which found unseaworthiness because of the unexplained failure of a piece of equipment to function properly. However, in each of those cases a defect in the equipment or in its design is easily inferrable from the facts of the case. Thus, in Mills v. Mitsubishi Shipping Co., 358 F.2d 609 (5 Cir. 1966) the violent shaking of the winch lever described as a malfunction, was clearly attributable to a defect in the mechanism and in Texas Menhaden Co. v. Johnson, 332 F.2d 527 (5 Cir. 1964) the bending of the crane indicated a defect in the crane itself. Again, in Van Carpals v. The S.S. American Harvester, 297 F.2d 9 (2 Cir. 1962) it was readily inferrable that steam would not have escaped from the valve if it was not defective. The opinion states "the valve was actually not in a safe condition." Likewise, In Re Read's Petition, 224 F. Supp. 241 (S.D.Fla.1963) involved a winch which would not hold. Here again, it was obvious that the equipment itself was defective.
 
 
 49
 No defect in the equipment here involved was shown by the libelant and none is inferrable from the facts disclosed in the record. Nor is this a case in which there is or could be an allegation that the equipment was improperly designed. The design of the equipment was not an issue before the district court. We are dealing with a simple cargo sling and not some complex piece of mechanical equipment requiring scientific and engineering skills in its design. Thus, those cases upon which the majority relies are clearly distinguishable. Similarly, the cases which have established that a vessel may be rendered unseaworthy as a result of cargo handling operations have predicated the finding of unseaworthiness on the improper method of stowing or loading the cargo. See, e. g., Blassingwill v. Waterman Steamship Corp., 336 F.2d 367 (9 Cir. 1964); Ferrante v. Swedish American Lines, 331 F.2d 571 (3 Cir. 1964). Again, no such allegation was made in this case, and there was no showing that the cargo was improperly handled. Rather, we are presented with a complaint which alleges that the equipment used to load heavy steel beams was inadequate to the task attempted, and that as a result of using this inadequate and unseaworthy equipment the libelant was severely injured. After considering conflicting evidence from witnesses who appeared in open court, the district court found that the use of a chain sling was customary in the industry and that such use was not unreasonable. The evidence showed that both chain and cable slings were used in handling steel, and there was opinion testimony that the chains were to be preferred over cable for heavy steel such as was involved here.
 
 
 50
 Both the libelant and the respondent presented substantial and conflicting evidence in support of their respective contentions. It was for the district court to make the credibility determinations necessary to resolve the factual disputes. Our standard of review precludes us from substituting our judgment for that of the district court if there is substantial evidence to support its conclusions. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954). I can not conclude that the factual findings of the district court are clearly erroneous, Smith v. M/V Gisna, 362 F.2d 164 (5 Cir. 1966), or that its legal conclusion that the ship was seaworthy is not supported by the facts found.
 
 
 51
 Although the use of equipment that is customary and usual in an industry may nevertheless fail to meet the standards of seaworthiness, The T. J. Hooper, 60 F.2d 737, 740 (2 Cir. 1932), the record before us will not support a conclusion that as a matter of law the use of the chain slings failed to meet the standards of seaworthiness. Both chain slings and cable straps had been used at the State Docks, and aside from the accident which gave rise to this suit, the evidence showed no other incidents where comparable steel cargo had slipped. Admittedly, some comparatively light, small pieces of steel had fallen on the day of the accident in question. There was a conflict in the evidence as to what caused the small steel to fall. The fact that there was some evidence that chains should not have been used for loading pre-bundled small steel pieces is certainly not conclusive on the issue of whether steel chains were unseaworthy when handling large, heavy steel members.[1] The difficulties presented by the weight and size of the large "I" beams could reasonably require equipment substantially different from that needed to handle many small pieces of steel which had been bundled together. The testimony indicated that heavy steel of the type here involved was difficult to load and the possibility that it might slip was well known, regardless of the equipment used.
 
 
 52
 In holding that the vessel was unseaworthy because the chain slings failed to perform the operation for which they were designed, the majority is confusing situations in which equipment, though operating as designed, nevertheless causes an injury, and circumstances in which equipment, as a result of failing to perform its function as intended and for which it was designed, causes an injury. Those cases involving defective equipment or equipment improperly designed belong to the latter class, and unseaworthiness follows inexorably from the failure to operate properly. See, e. g., Mills, supra. The loading of cargo with equipment that is usual and customary and which is operating as designed free of any defect, however, falls within the former class of situations and the mere occurrence of an accident with resulting injury does not imply unseaworthiness. The transitory carriage of large, heavy steel beams necessary to load a vessel involves, by the very nature of the operation, the continual risk of the steel slipping from its cargo sling and falling. It is a risk which is inherent in the operation, and though it can and must be minimized there was no showing that it can be entirely avoided. Thus, by finding unseaworthiness as a matter of law, this Court is holding that the ship is required to provide a means of loading a vessel which will insure that there can be no slippage of cargo during loading, a standard much greater than reasonable fitness. Since the test for seaworthiness is not whether the equipment is sufficient to prevent injury under all circumstances, but whether it is reasonably fit for its intended purposes, the mere occurrence of a single incident in which a steel beam fell from the chain sling is not, in light of the nature of the risk involved and the lack of any demonstrable or inferrable defect, sufficient to render the vessel unseaworthy as a matter of law. This Court noted in Jefferson v. Taiyo Katum, K.K., 310 F.2d 582, 583 (5 Cir. 1962) that "It will be a rare case where the issue of unseaworthiness as the proximate cause of an injury is to be resolved for or against a shipowner as a matter of law." Surely this is not such a case.
 
 
 53
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 There was some testimony which indicated that the strapping used to hold the small bundles of steel together broke causing the steel to fall. If such was the case, the evidence that the smaller steel fell has even less probative value in establishing that the chains were unseaworthy when used to load the massive "I" beams in question